UNITED STATES of America, Plaintiff,

v.

Matthew IANNIELLO, a/k/a "Matty the Horse," Benjamin Cohen, a/k/a "Benny Cohen," Paul Gelb, Alfred Ianniello, Osbro Restaurant, Inc., d/b/a "Umberto's Clam House," Robert Ianniello, P & G Funding Corp., d/b/a the "Mardi Gras," Pauline Gelb, John Zaffarano, John Doe, and John Doe, Inc., d/b/a "John Doe Restaurant," Defendants.

No. 86 Civ. 1552–CSH.

United States District Court,
S.D. New York.

Sept. 30, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; Robert L. Ullmann, Sp. Asst. U.S. Atty., Randy M. Mastro, Asst. U.S. Atty., of counsel.

Gerald L. Shargel, New York City, for defendants Robert Ianniello and Osbro Restaurant Corp.

Hoffman, Pollok & Gasthalter, New York City for defendant Alfred Ianniello; Judd Burstein, of counsel.

Jay Goldberg, P.C., New York City, for defendant Matthew Ianniello; Michael Berger, of counsel.

## ON MOTION TO DISMISS

HAIGHT, District Judge:

Defendants move, pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss the Amended Complaint in the captioned action. The factual background of this civil RICO case, brought under 18 U.S.C. § 1964, is stated in this Court's Memorandum Opinion and Order of April 16, 1986, familiarity with which is assumed. The motion is denied.

Except as to Robert Ianniello,[1] defendants do not contend the Government has failed to state a claim upon which relief can be granted. Rather, defendants argue that some aspects of the relief sought by the Government are unavailable.

 Assuming *arguendo* that some or all of defendants' contentions are meritorious, they do not justify dismissal of the Amended Complaint. Rule 56(c), F.R. Civ.P., provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Therefore, "a meritorious claim will not be rejected for want of a prayer for appropriate relief." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978). As long as the plaintiff "might conceivably have some remedy" for the claim asserted, a Rule 12(b)(6) challenge must fail. *Build of Buffalo, Inc. v. Sedita*, 441 F.2d 284, 288 (2d Cir.1971).

Here, I need not speculate whether plaintiff "might conceivably" have some remedy if it prevails on the merits. Defendants do not contend that none of the prayed-for relief is available if the Government prevails on the merits; indeed, they concede this Court has the "power ... to grant extensive equitable relief." (Def. Reply Mem. at 3–4). Accordingly, their arguments are not properly presented in a Rule 12(b)(6) motion. The appropriate scope of relief may be argued and determined if the Government prevails on the merits.[2]

Defendants argue as to Robert Ianniello that his acquittal by the Court in the related criminal case, S85 Cr. 116 (EW) (the "Bar case"), collaterally estops the Government from pursuing the instant civil action. In the Bar case, Judge Weinfeld, applying the principles of *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), held the Government had failed to prove Robert Ianniello's participation in the charged RICO conspiracy by a fair preponderance of the independent, nonhearsay ev-

---

1. I consider defendants' arguments as to Robert Ianniello below.

2. I express no view, therefore, on the parties' arguments pertaining to the permissible scope of relief in this case.

idence. He therefore struck the hearsay evidence received against Robert. Having done so, Judge Weinfeld found the remaining evidence against Robert insufficient to sustain a conviction and granted his motion for acquittal pursuant to Rule 29(a), F.R. Cr.P.

The doctrine of collateral estoppel, or issue preclusion, bars relitigation of an issue of fact or law necessary to prior judgment if the party against whom the doctrine is invoked had a " 'full and fair' opportunity to litigate [its] claims" in the first action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332–33, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979); *see also Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir.1983). Generally, the differing standards of proof in criminal and civil proceedings preclude giving collateral estoppel effect to an acquittal in a subsequent civil action. *See e.g. United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361–62, 104 S.Ct. 1099, 1104–05, 79 L.Ed.2d 361 (1984). Defendants argue, however, that Judge Weinfeld, in his *Geaney* ruling, effectively held that the Government had not proved its case against Robert Ianniello even by a fair preponderance of the evidence, precluding relitigation of that issue.

Without reaching the merits of this argument, however, I reject Robert's effort to take cover in the collateral estoppel doctrine. There are reasons other than differing burdens of proof which may make it inappropriate to afford preclusive effect to an acquittal in a subsequent civil suit. Once such circumstance is the availability of evidence admissible in the civil case that was inadmissible in the criminal context. *Standefer v. United States*, 447 U.S. 10, 22–24, 100 S.Ct. 1999, 2007–08, 64 L.Ed.2d 689 (1980). In such a case, the Government is deprived of "the kind of 'full and fair opportunity to litigate' that is a prerequisite of estoppel." *Id.* at 22, 100 S.Ct. at 2007. "[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed." *Parklane Hosiery Co., supra*, 439 U.S. at 336, 99 S.Ct. at 654. That premise does not arise where the Government has at its disposal potentially result-altering facts admissible in the civil case that were inadmissible in the prior criminal proceeding.

In this civil case, the Government will be able to call a key witness not available to it in the criminal case: Robert Ianniello. Moreover, if Robert, consistent with his practice to date,[3] invokes his Fifth Amendment privilege to remain silent and is upheld in doing so, the Government may ask the finder of fact to draw an adverse inference from the assertion of that privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). Whether or not he invokes the privilege, the Government will have at its disposal significant evidence unavailable to it in the criminal case.[4]

The motion is denied.[5]

It is SO ORDERED.

---

**3.** Robert Ianniello and the company he heads, Osbro Restaurant, Inc., have made sweeping use of the Fifth Amendment in pre-trial discovery in this case. See this Court's Opinion on the Government's motion for an order appointing a receiver *pendente lite*, filed concurrently herewith.

**4.** In a Memorandum Opinion and Order filed concurrently herewith, granting the Government's motion for appointment of a receiver *pendente lite*, I have concluded that invocation of the Fifth Amendment may properly form the basis of an adverse inference.

**5.** Because I view the possibility of calling Robert to testify and drawing an adverse inference from invocation of the Fifth Amendment privilege sufficient to preclude application of the collateral estoppel doctrine, at least in the present posture, I do not rely on the other additional nonhearsay evidence the Government asserts it has developed. To the extent that information was available to the Government when the Bar case was tried, it is doubtful it would preclude application of the collateral estoppel doctrine. *Cf. Jones v. United States*, 466 F.2d 131, 136 (10th Cir.1972) ("new" evidence that was "historical in nature and could have been admitted at the first trial" would not bar application of collateral estoppel doctrine).

## MEMORANDUM OPINION AND ORDER

The Government renews its application for the appointment of a receiver *pendente lite* of Umberto's Clam House, owned by defendant Osbro Restaurant, Inc. The action is brought under the "Civil Remedies" section of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1964. The factual background of the case is set forth in the Court's Memorandum Opinion and Order of April 16, 1986, which denied the requested relief on the record then existing. Familiarity with that Opinion is assumed.

The Court's prior opinion held, in essence, that the Government had not made a sufficiently strong factual showing of certain individuals' continued skimming from Umberto's to justify appointment of a receiver. I suggested that the Government's case might be bolstered by expert opinion evidence from a witness qualified in restaurant procedures and accounting. Slip op. at 13. Since the entry of that Opinion, the Government retained such an expert, who conducted certain inquiries and submitted an affidavit. Defendants retained experts who also prepared affidavits. The experts have been subjected to cross-examination in depositions.

The Government sought to bolster the record further by pre-trial discovery. That effort was blocked by a blanket invocation of the Fifth Amendment. Defendant Robert Ianniello, the president of Osbro, pleaded the Fifth Amendment in bar to all questions put to him at his deposition. Defendants Matthew and Alfred Ianniello, in a pragmatic time-saving device, have stipulated with the Government that they would also invoke the Fifth Amendment if sought to be deposed. In written interrogatories propounded to Osbro, the Government asked *inter alia* for the names and addresses of "all officers, directors, employees and suppliers of Osbro"; and for the identification and description of the custodian, location and general description of all documents, including pertinent employment and business records of Osbro's relevant to the subject matter of the action. In addition to making objections and assertions with which I need not presently deal, Osbro also responded:

> "There is no person who can answer the remainder of [these interrogatories] on behalf of defendant without invoking his Fifth Amendment right to decline to answer on the ground that any answer might tend to incriminate him."

I have considered the recently developed expert testimony and defendants' invocation of the Fifth Amendment within the context of the entire record. I now conclude that the Government is entitled to the appointment of a receiver.

### I.

Count 37 of the superseding criminal indictment tried before Judge Weinfeld charged that from on or about September 1, 1982 up to and including the filing of the indictment on February 15, 1985, Matthew Ianniello, Alfred Ianniello, and other individuals entered into a fraudulent scheme, part of that scheme being "that the said defendants and their co-schemers regularly skimmed, diverted, extracted, and converted to their own use a substantial portion of the daily gross receipts of Osbro." Indictment at ¶ 98. The jury convicted Matthew and Alfred Ianniello on this count. Under the RICO statute, they are now estopped from denying those allegations of the criminal charge. § 1964(d).

The central issue on the present motion is whether the Government has made a sufficient showing of post-indictment, continuing skimming on the part of these defendants to justify appointing a receiver to take charge of Umberto's affairs. The receiver's essential function would be to put an end to any continued skimming or improper diversion of Umberto's receipts into the hands of one or more of the individual defendants.

### II.

I shall first consider the affidavits and deposition testimony of the expert witnesses called by the parties. Before doing

so, certain preliminary observations should be made.

Under an order entered in the criminal case by Judge Weinfeld, and continued in this civil case by this Court, Osbro has been submitting on a monthly basis certain financial records relevant to its operations. Those records have been reviewed by a certified public accountant retained by the Government, Murray J. Weinman. Weinman's detailed affidavit of May 21, 1986 in support of the renewed application summarizes his findings at ¶¶ 25 and 26:

"25. According to the records which defendants have produced pursuant to court order and which I have reviewed, during the past year (from April 1, 1985, to March 31, 1986), Umberto's had average monthly gross receipts of approximately $73,000. Also according to those records, during the six months immediately preceding the indictment in the criminal case (from August 10, 1985, to February 11, 1985), Umberto's had average monthly gross receipts of approximately $73,000. Thus, Umberto's average monthly gross receipts, as reflected in those records, were the same for the pre- and post-indictment periods described above.

"26. According to the records which defendants have produced pursuant to court order and which I have reviewed, approximately 40 percent of Umberto's gross receipts were spent on food and beverage costs in 1984 and 1985."

Monthly gross receipts which average $73,000 yield annual gross receipts of $876,000.

The motion papers also include transcripts of telephone conversations between Matthew Ianniello and Alfred Ianniello which occurred on September 20 and October 13, 1982. Notwithstanding defense counsel's faint suggestions to the contrary, it seems clear enough that in these conversations Matthew and Alfred Ianniello are discussing economic aspects of operations at Umberto's. The conversations establish that Alfred Ianniello was keeping a close eye on the restaurant, and then discussing

with Matthew Ianniello problems of waste, inefficiency of staff, and the like. At one point Alfred Ianniello says to Matthew Ianniello: "We average thirty, Matty, we average thirty a week." Transcript of September 20, 1982 conversation at 3. The context of the conversation shows that Alfred Ianniello is referring to demonstrated average gross receipts of $30,000 a week. At another point in the transcript, Alfred Ianniello quotes himself as criticizing a staff member named Oscar:

"I said Oscar why'd you stop the extra five? Well, it's slowing down. I said what do you mean slowin' down did almost like thirty-five thousand last week, that's not this week. The week before." *Id.* at 2.

Further references to an apparently realized gross receipts average of $30,000 per week appear in the transcript of the October 13, 1982 conversation at 9 and 11.

Average weekly gross receipts of $30,000 yield annual gross receipts of $1,560,000.

This brings us to the testimony of the Government's expert witness. He is Stuart L. Feigenbaum. Feigenbaum is qualified to give testimony on the points at issue. He holds a Bachelor of Science degree from the School of Hotel Administration at Cornell University. Following employment as director of food and beverage services at various hotels and clubs, Feigenbaum joined the firm of Laventhol & Horwath, certified public accountants, in September 1983, where he is the manager in New York in charge of the Food Services and Restaurant Advisers Group.

Feigenbaum and staff from Laventhol & Horwath visited Umberto's over a five day period in late April and early May, 1986. On the basis of what was observed and calculations made in the light of Feigenbaum's experience, he reached a conclusion which is stated in ¶ 6 of his affidavit:

"Based upon my knowledge of industry practices and standards, my experience in the restaurant business and my work regarding Umberto's Clam House, I have formulated an estimate of the yearly

gross receipts of Umberto's Clam House. My conservative estimate of the gross yearly receipts of Umberto's Clam House is $1.3 million per year. By 'conservative estimate,' I mean that, in my estimation, Umberto's Clam House has gross receipts of at least $1.3 million per year and may have substantially higher receipts than $1.3 million per year."

The details of Feigenbaum's methodology appear in his answers, set out in the margin,[1] to the questioning of defendants' counsel at his subsequent deposition.

Feigenbaum also stated in his affidavit at ¶ 4:

"Based upon my knowledge of industry practices and standards and my experience in the restaurant business, I have found that for Italian restaurants serving no 'hard' alcoholic beverages, approximately 28–32 percent of the average restaurant's total receipts are spent on food and beverage costs."

This conclusion has arguable significance because, as noted *supra*, Weinman's review of the records submitted to the Government by Umberto's showed that approximately 40% of the gross receipts were spent on food and beverage costs in 1984 and 1985. The Government reasons that the lower cost ratio testified to by its expert leads to an inference that Umberto's is underreporting its gross receipts.

As defendants' counsel points out in his affidavit in opposition, when early 1986 is considered as well as the earlier years, the actual ratio of food and beverage costs to

1. A. I developed a methodology to visit the restaurant over a five day period, and developed a schedule where we could visit the restaurant during different times of the day and evening, when meal periods—when meals were being served. I used the staff, the professional staff of Laventhol & Horwath, and scheduled them to go at different workable meal periods. And by workable, I mean where we can go, be unobserved, to have a normal meal, and observe the goings on of the restaurant during that time. After we prepared a schedule which you have a copy of, I instructed the staff of what procedure I would like them to follow. Basically, their procedure was to go to the restaurant, observe how many patrons were in the cafe prior to entering the restaurant, and observe how many patrons were in the dining room. By cafe I mean the outdoor segment of the restaurant. I requested that they be seated in a location where they could view the cash register, and during their meal period, to view the cash register transactions and the corresponding number of patrons that were related to each register transaction that they viewed. They did so by observing a waiter go to a table, pick up a check, and note how many people are at that table, and observed the cash register transaction. If they had any trouble remembering any of the numbers, I instructed them to take notes, but to do so in a fashion where they would not be observed. And I offered a few recommendations; being, to go to the men's room or the lady's room, male or female, and to jot down on a napkin or on a card what their observations were. Then to fill out a form, which you have a copy of. Complete that form at the end of their visit, and give that form to me. I used that form in two manners. One, I used that procedure to develop an estimate of what the average check would be. The average check was the total of all the cash register transactions we observed, divided by 108.25 percent to remove the tax from that transaction, and then divide that resulting number by the number of covers for that meal period. Excuse me. The number of covers that we observed corresponding to those transactions. That arrived at an observed average check. We also recorded the number of covers observed in the dining room and the number of covers observed in the outdoor cafe during those meal periods. The resulting information was an observed average check for 3 basic meal periods, and an estimate of what the number of covers were during those resulting meal periods, over approximately 25 visits to the operation.

Q. Is that your answer? Are you finished?
A. Excuse me. Then to complete the calculation, I estimated, based on the observed average check, what a conservative average check would be, and I reduced the observed average check in all cases. I reduced the lunch average check by the most amount, because I felt our observations were perhaps a little bit high and might not be consistent with the restaurant over an annual period. I reduced the dinner average check and I reduced the supper average check a minor amount. I then estimated the number of covers based on the observations for each meal period for each day of the week, and arrived at a number of covers—excuse me, a number of turns, which is a turnover for each meal period for the restaurant. I extrapolated that information, and multiplied it times the average check, to arrive at $1.3 million, which I believe to be a very conservative estimate.
Q. You said everyday of the week. You weren't there for everyday of the week. You were only there for five or 6 days?
A. That's correct. We had 25 visits over five days.

gross receipts, based on the documents provided to Weinman, is 38.54%. Shargel affidavit of June 30, 1986 at ¶ 6.

In addition to their counsel's cross-examination of Feigenbaum at the deposition, defendants rely upon the affidavits of two expert witnesses of their own. One is Thomas A. Bloom, president of Southern Hospitality Consultants, a private consulting firm which advises restaurant owners, financial service institutions, law firms, and educational institutions on all phases of restaurant management. The other witness is David L. Romm, currently assistant professor at the School of Hotel Administration of Cornell University, with expertise in food and beverage management. Both witnesses had prior experience in the field. They are also qualified to give expert testimony on the issues. Bloom and Romm gave affidavits, and were subsequently cross-examined by Government counsel at depositions.

The defendants' experts, predictably enough, are critical of Feigenbaum's methodology, and dispute his conclusions.

With respect to Feigenbaum's calculation of the cost ration at Umberto's as a basis for inferring continuing skimming, I find myself unable to place much confidence in it. Feigenbaum's "finding," expressed in ¶ 4 of his affidavit, of a 28–32% ratio "for Italian restaurants serving no 'hard' alcoholic beverages" suggests, at least, a personal familiarity on his part with a number of such restaurants; but cross-examination demonstrated a lack of personal familiarity with restaurants whose profiles are comparable to Umberto's. Feigenbaum was, of course, at liberty to draw upon whatever other expertise he had to form a general opinion. However, his estimate of a 28–32% cost ratio for Umberto's is significantly undermined by the National Restaurant Association's report on industry operations for 1985: a report prepared in cooperation with Laventhol & Horwath. That report (D.Ex. 3 to the Feigenbaum deposition) demonstrates that restaurants in the northeast in the top quartile in terms of gross sales showed a median food and beverage

cost ratio of 41%. *Id.* at 82. Even accepting that the "northeast" area excluded New York City, and Feigenbaum's rather surprising statement that food costs *less* here, I do not think the Government can make much of the 38.54% ratio reported by Umberto's to Weinman.

I take a different view of Feigenbaum's second opinion, namely, his calculation of Umberto's gross receipts. Clearly this calculation goes to the heart of the matter. Evidence tending to show that Umberto's actual gross receipts are significantly higher than those reported to the Government would support an inference of continued wrongdoing.

Defendants' experts, Bloom and Romm, are critical of Feigenbaum's gross receipt calculations, in various respects and in varying detail. Bloom says only that "a single, five-day survey" is insufficient to yield "that type of sales data" with sufficient accuracy. However, Bloom gave his opinion within a particular context: that of an accounting firm's restaurant clients "who are preparing a complete package to submit to a financial lending institution." Bloom affidavit at ¶ 24.

I accept the proposition that if venture capitalists were seeking bank financing to open a new restaurant in Little Italy, they would probably need more detailed income projections than those submitted by Feigenbaum on the present motion. But it does not follow that Feigenbaum's calculations are without any probative value.

Romm echoes Bloom's criticism that Feigenbaum's calculations would not be sufficient for a "feasibility study" in the context of "a person thinking about opening a restaurant next to Umberto's ..." Affidavit at ¶ 23. Again, the point may be conceded without depriving Feigenbaum's calculations of all evidentiary value.

Romm criticizes those calculations in other respects. Primarily, Romm attacks Feigenbaum's assumption that visits to the restaurant over a five-day period in April and May does not give sufficient account to "the variable patterns of customer demand and the seasonal nature of much of the

restaurant business ..." Affidavit at ¶ 25. Defendants' suggestion—Romm's criticism in this regard is meaningless unless they make it—must be that Feigenbaum and his staff visited Umberto's at a peak seasonal period, thereby skewing the annual gross receipts upwards.

That suggestion is not borne out by the figures submitted by Osbro to Government accountant Weinman. Presumably defendants ask me to regard those figures as accurate. As Weinman stated in his affidavit, during the twelve-month period from April 1, 1985 to March 31, 1986 Umberto reported average monthly gross receipts of approximately $73,000. Affidavit at ¶ 25. Details for each month are reported in ¶¶ 12–23. The spread is between a low of $47,000 in February 1986 and a high of $105,000 in August 1985. The reported gross receipts for April 1985 were $64,000 and for May 1985 $84,000, figures which straddle the average of $73,000. There is no basis for me to conclude that Feigenbaum selected for his testing that particular week in which Umberto's enjoys its greatest seasonal success.

I also note that while Bloom and Romm criticize Feigenbaum's methodology, they do not express an opinion that, given Umberto's characteristics and marketing opportunities, the figures reported by Osbro to Weinman carry with them the badges of reliability.

Lastly, I note that Feigenbaum's calculations are corroborated by the total annual gross receipts derived from the $30,000 weekly receipts which emerge from the 1982 telephone conversations between Matthew and Alfred Ianniello.

For these reasons, I accept Feigenbaum's calculation of gross receipts at Umberto's not as the final, definitive word within the context of a formal presentation to a financial institution, but as evidence of some probative value, significantly corroborated by other evidence in the record.

### III.

■ I come now to the concerted refusal of Matthew, Alfred and Robert Ianniello, and Osbro, based on the Fifth Amendment, to testify or furnish pertinent evidence in pretrial discovery proceedings. The Government says that from those refusals I should draw an inference adverse to defendants on the disputed issue of continued skimming. Defendants argue that in the circumstances of the case, no inference should be drawn.

The Fifth Amendment privilege against self-incrimination "applies alike to civil and criminal proceedings," *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). But as a general rule, and in obvious contrast to criminal cases, in civil cases a party's Fifth Amendment refusal to testify may form the basis for an adverse factual inference. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Brink's Inc. v. City of New York,* 717 F.2d 700 (2d Cir.1983). Imposition of an unwelcome civil sanction may not be based solely and automatically upon assertion of the Fifth Amendment, *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (state statute cannot, consistent with Fifth Amendment, terminate political party officer's term of office if he refuses to waive privilege before grand jury). But *Lefkowitz* makes clear that, under *Baxter,* an adverse inference based upon Fifth Amendment silence may in a civil case be "one of a number of factors to be considered by the finder of fact," if "given no more probative value than the facts of the case warranted," 431 U.S. at 808 n. 5, 97 S.Ct. at 2137 n. 5. The adverse inference may properly be drawn in the context of a motion for preliminary equitable relief. *SEC v. Musella,* 578 F.Supp. 425, 429–31 (S.D.N.Y.1984) (preliminary injunction barring future securities violations and temporarily freezing defendants' assets).

The Fifth Amendment protects individuals from self-incrimination "in any criminal case." Thus the salient constitutional inquiry in a given case is whether the proceeding is "criminal." "Criminal" is not synonymous with unwelcome or prejudicial. For example, the Fifth Amendment does

not apply to proceedings which may end in deportation, *Bilokumsky v. Tod,* 263 U.S. 149, 155, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923), or disbarment, *In re Daley,* 549 F.2d 469, 474–77 (7th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977).

On the other hand, the "label-of-convenience" affixed by the legislature to a particular procedure cannot alone decide the issue, lest courts "disregard substance," *In re Gault,* 387 U.S. 1, 50, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967) (Fifth Amendment applies to juvenile "delinquency" proceedings which can result in incarceration). Thus the inquiry in the case at bar does not end with the "civil remedies" label Congress affixed to § 1964, or to its expressed intent not "to visit punishment on any individual; the purpose [of § 1964] is civil." S.Rep. No. 91–617, 91st Cong., 1st Sess. (1969) at 81. Proceedings civil in form may yet by their nature be criminal for Fifth Amendment purposes. *United States v. United States Coin & Currency,* 401 U.S. 715, 718, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1971), citing *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).

*Boyd* states generally that "proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal" for Fifth Amendment purposes. *Id.* *United States v. United States Coin & Currency* expanded on that theme at 401 U.S. 718, 91 S.Ct. 1043:

> "From the relevant constitutional standpoint there is no difference between a man who 'forfeits' $8,674 because he has used the money in illegal gambling activities and a man who pays a 'criminal fine' of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force."

In the case at bar, the Government contends these principles cause no legitimate concern because at present it is doing no more than seeking the appointment of a receiver in aid of its efforts, in the words of § 1964, "to prevent and restrain violations" of § 1962. This, it is said, is a civil remedy bearing no resemblance to forfeiture of property by reason of past offenses.

It is not quite as simple as that, since the ultimate relief sought by the Government in its amended complaint includes divestiture of the individual defendants' interests in Osbro and Umberto's. Whether one's property is "forfeited" or "divested," one no longer has it to enjoy; and to obtain a § 1964 divestiture of property, the Government must show the remedy is necessary to "prevent" or "restrain" violations of a criminal statute. But I do not write upon a clean slate. The Supreme Court has explicitly recognized that the equitable remedy of divestiture falls outside the criminal process, and may be directed by the district courts in appropriate cases not to punish the transgressor, but to protect the public. In *United States v. E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 326, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318 (1961), involving violation of the antitrust laws, the Court said:

> "Courts are not authorized in civil proceedings to punish antitrust violators, and relief must not be punitive. But courts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests. Divestiture is itself an equitable remedy designed to protect the public interest."

And it has been settled at least since *In re Debs,* 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), that a civil proceeding to enjoin proscribed acts "is not rendered in criminal in character by the fact that the acts also are punishable as crimes." *United States v. Cappetto,* 502 F.2d 1351, 1357 (7th Cir. 1974), citing *Debs.*

*Cappetto* holds that a government complaint under § 1964 constitutes "a civil proceeding," in which the plaintiff government "is entitled to discovery as in any other

civil case," although a defendant "of course has the right under the Fifth Amendment to refuse to answer a specific question on the ground that the answer may tend to incriminate him." *Id.* at 1359. *Cappetto* does not deal squarely with the issue of whether the finder of the fact may draw an adverse inference from the defendant's resulting silence; but the propriety of the inference seems implicit in the *Cappetto* court's rationale.

I conclude that the case at bar is civil in nature, and that a probative adverse inference may properly be drawn from the corporate and individual defendants' invocation of the Fifth Amendment. That the details of Umberto's operations which defendants have shielded from the Government's view are probative requires no discussion, although I may observe in passing that defendants' experts criticize the Government's expert for failing to develop information which defendants themselves steadfastedly refused to provide.

## IV.

Defendants also argue that because by this action the Government seeks, *inter alia*, to banish the individual defendants from participating in the bar and restaurant business in New York State, the action is barred by the Twenty-first Amendment, which "bestowed upon the states broad regulatory power over the liquor traffic within their boundaries." *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 299, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945).

■ There is no substance to this constitutional claim. Judge Weinfeld rejected it in the context of the criminal trial, *United States v. Ianniello*, 621 F.Supp. 1455, 1474 (S.D.N.Y.1985):

"The Amendment does not forbid federal prosecution of a criminal scheme incidentally involving the trade in alcoholic beverages. The indictment here charges that defendants' conduct was a federal felony because it furthered a criminal scheme to defraud in connection with which the use of the mails was reasonably forseeable. It is of merely inciden-

tal relevance to the scheme that the mailings involved consisted of communications between defendants and the SLA. The alleged false statements to the SLA, and the mailings resulting from them in the ordinary course of business, were 'incident to an essential part of the scheme' charged, which was to skim money from restaurants and bars. Under these circumstances, the Twenty-First Amendment raises no obstacle to the federal prosecution." (footnotes omitted).

The Government's civil action under § 1964 seeks no more, and no less, than the prevention and restraint of future implementation of that very scheme alleged in the indictment, whose relation to trade in alcoholic beverages Judge Weinfeld properly characterized as incidental for Twenty-first Amendment purposes. There is no difference in principle.

■ While I agree with Judge Weinfeld's characterizations, and apply them here, I would reach the same conclusion if the effect of the Government's § 1964 action upon the alcoholic beverage trade within the state be regarded as direct and central, rather than indirect and incidental. Federal policy may nonetheless prevail. The Twenty-first Amendment does not automatically shelter participants in that trade from the impact of federal policy as expressed in statute or regulation. At least where, as here, "the State's central power under the Twenty-first Amendment of regulating the times, places, and manner under which liquor may be imported and sold is not implicated ..., the balance between state and federal power" may even go so far as to bar enforcement of a state statute adopted pursuant to the Amendment. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 716, 104 S.Ct. 2694, 2709, 81 L.Ed.2d 580 (1984) (state statute prohibiting cable television systems operating in state from retransmitting out-of-state signals containing alcoholic beverage commercials held an unconstitutional restriction on advertisers' right to engage in protected commercial speech). See also *California*

*Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 109, 114, 100 S.Ct. 937, 947, 63 L.Ed.2d 233 (1980) (state wine pricing statute invalidated as conflicting with federal antitrust statutes enacted pursuant to Commerce Clause; federal courts begin with a "pragmatic effort to harmonize state and federal powers," but state concerns must in appropriate cases yield federal goals of greater stature).

In the case at bar, no conflict between the federal anti-fraud statutes and New York liquor laws is suggested. The case is therefore closer on its facts to *Frankfort Distilleries, supra,* where the antitrust statute was not "applied to defeat the policy of the state." 324 U.S. at 299, 65 S.Ct. at 664. In such circumstances, the Court said of the Twenty-first Amendment:

> "It has not given the states plenary and exclusive power to regulate the conduct of persons doing an interstate liquor business outside their boundaries. Granting the state's full authority to determine the conditions upon which liquor can come into its territory and what will be done with it after it gets there, it does not follow from that fact that the United States is wholly without power to regulate the conduct of those who engage in interstate trade outside the [state's] jurisdiction. *Ibid.*

There is no discernible conflict between the federal statute prohibiting fraudulent use of the mails, and the laws New York has enacted to control trade in alcoholic beverages. In consequence, *Frankfort Distilleries* applies directly; *Capital Cities Cable* and *California Liquor Dealers* apply *a fortiori.*

The antitrust statutes involved in the cited cases derive from the constitutional power of Congress to regulate commerce, *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 484–85, 60 S.Ct. 982, 987, 84 L.Ed. 1311 (1940), a source of authority they share with RICO, which has as its purpose "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S.Rep. No. 617, 91st Cong., 1st Sess. at 76. "The plenary power of Congress over both interstate and foreign commerce is not open to dispute, and that body is not limited to any one particular approach to effectuate" its concerns, *California Bankers Assn. v. Schultz,* 416 U.S. 21, 46, 94 S.Ct. 1494, 1510, 39 L.Ed.2d 812 (1974). The civil RICO remedies invoked by the Government at bar constitute a particular congressional approach to a legitimate federal concern. The Twenty-first Amendment is irrelevant.

### V.

So the question arises whether or not, on this expanded record, the preliminary equitable relief prayed for should be granted.

*Cappetto, supra,* interpreted the intent of Congress in § 1964 as providing for injunctive relief against violations of § 1962 "without any requirement of a showing of irreparable injury other than that injury to the public which Congress found to be inherent in the conduct made unlawful by section 1962." 502 F.2d at 1358–59. This seems to me a correct analysis, particularly in view of the deference the Supreme Court more recently paid to Congress's "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985) (construing private remedies under § 1964(c), and quoting Pub.L. 91–452, § 904(a), 84 Stat. 947).

On the present record, I conclude that the Government has established a likelihood of success on the merits. The existence of substantial prior skimming, at least on the part of Matthew Ianniello and Alfred Ianniello, has been conclusively established by the criminal trial. While Judge Weinfeld dismissed the criminal charges against Robert Ianniello, at least the titular president of Osbro, I have previously observed that during the period covered by the indictment Robert Ianniello either could not or would not control an improper diversion of funds which the criminal jury found had taken place. There has

been no change in the pattern of gross receipts at Umberto's. That supports an inference that what was going on is still going on. The evidence of the Government's expert witness, tending to show gross receipts significantly greater than those reported, is not overcome by the thrust of the opposing experts' opinions, and is corroborated by other evidence in the record. Defendants' invocation of the Fifth Amendment permits an adverse inference on probative issues which I draw. There is precedent under § 1964(a) and (b) for the appointment of a receiver at the Government's behest. *United States v. Local 560 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 780 F.2d 267 (3d Cir.1985).[2]

## VI.

The Government's motion for the appointment of a receiver *pendente lite* of Osbro Restaurant, Inc., doing business as Umberto's Clam House, is granted.

The Government is directed to settle an order consistent with this Opinion on seven (7) days' notice.

The order will identify the name and address of the proposed receiver, and state in detail his duties and responsibilities, which are to include regular status reports to the Court.

The Government's order must also include the suggested compensation for the receiver, and provide for reimbursement of his expenses.

The order will provide that the receiver's compensation and expenses will be paid in the first instance by the Government, without prejudice to an application by the Government at the time of final judgment, should the Government prevail, to have

such compensation and expenses taxed against one or more of the defendants.

Defendants may, in any proposed counter-order, deal with the issues of whether a performance bond or other financial guarantee against loss should be given, 18 U.S.C. § 1964(b); and whether execution of the Court's injunctive order appointing a receiver should be suspended pending appeal under Rule 62(c), F.R.Civ.P.

The foregoing is SO ORDERED.

---

**2.** I appreciate that in *Local 560* the district court appointed a receiver to conduct the union's affairs after a full plenary hearing. Defendants in the case at bar say that at the very least a comparable hearing should precede any equitable relief. I do not agree. Section 1964(b) expressly authorizes "restraining orders or prohibitions ... [p]ending final determination of

the action...." The issue at bar is relatively narrow, in contrast to those in *Local 560*. Furthermore, if defendants are justified in their refusal to testify or produce additional information on any aspect of Umberto's operations, it is difficult to see how much a plenary trial will add. Defendants make no concrete offers of proof.