824 F.2d 203
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Matthew IANNIELLO, a/k/a "Matty the Horse;" Benjamin Cohen,
a/k/a "Benny Cohen;" Paul Gelb; Alfred Ianniello; Osbro
Restaurant, Inc., d/b/a "Umberto's Clam House;" Robert
Ianniello; P & G Funding Corp., d/b/a "Mardi Gras;"
Pauline Gelb; John Zaffarano; John Doe; and John Doe,
Inc., d/b/a "John Doe Restaurant," Defendants,
Osbro Restaurant, Inc., and Robert Ianniello,
Defendants-Appellants, Cross- Appellees.
 Nos. 1143, 1203, Dockets 86-6251, 87-6003.
 United States Court of Appeals,
Second Circuit.
 Argued May 11, 1987.
Decided July 21, 1987.
 
 Randy M. Mastro, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., David R. Lewis, Nancy Kilson, Asst. U.S. Attys., S.D.N.Y., of counsel), for plaintiff-appellee, cross-appellant.
 Mark F. Pomerantz, New York City (Fischetti & Pomerantz, New York City, of counsel), for defendant-appellant, cross-appellee Osbro Restaurant, Inc.
 Michael G. Berger, New York City, of counsel, for defendant-appellant, cross-appellee Robert Ianniello.
 Before LUMBARD, PRATT, and ALTIMARI, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 This appeal raises the narrow issue of whether, pursuant to 18 U.S.C. Sec. 1964, the district court had a sufficient basis to appoint a receiver to manage Umberto's Clam House. The defendants-appellants, Robert Ianniello and Osbro Restaurant, Inc., do not raise the issue of, and thus we have no occasion to consider, whether a receivership, traditionally used to protect the value of an asset that is the subject of litigation, see Kelleam v. Maryland Casualty Co., 312 U.S. 377, 380-81, 61 S.Ct. 595, 597-98, 85 L.Ed. 899 (1941), may properly be used, as here, to ensure the collection of taxes. Because the parties have done so we, too, assume, but do not decide, that this is a proper case for a receiver. We affirm the district court's order appointing the receiver as fully justified by the evidence, and further affirm Judge Haight's imposition of the costs of the receivership on the government pending trial.
 
 BACKGROUND
 
 2
 The instant litigation followed close on the heels of the criminal convictions of many of the same defendants, convictions that were affirmed by this court in United States v. Ianniello, 808 F.2d 184 (2d Cir.1986). That prosecution centered around charges that defendant Matthew Ianniello had skimmed the receipts of six restaurants, including Umberto's Clam House, all owned and operated by him and his associates. Matthew Ianniello was convicted on all charges against him, and in addition to his prison sentence he was ordered to forfeit to the government $666,666.67. Alfred Ianniello was convicted on charges based on skimming receipts from Umberto's alone and was not subjected to any forfeiture. The charges and background of the criminal case are set forth in United States v. Ianniello, 621 F.Supp. 1455 (S.D.N.Y.1985).
 
 
 3
 On February 21, 1986, two months after the criminal convictions, the government commenced this civil RICO suit. The complaint seeks injunctive relief against participation by Matthew, Alfred, and Robert Ianniello in the restaurant business, and an order compelling divestiture of their holdings in any bars or restaurants, including Umberto's. Robert Ianniello has always been listed formally as the owner of Umberto's.
 
 
 4
 The government moved several times in the district court for certain preliminary injunctive relief, including the appointment of a receiver for Umberto's. Although several of the defendants had consented to some of the requests for preliminary relief, Judge Haight denied the government's motion for a receiver on April 16, 1986, without prejudice to renewal if the government could demonstrate "a general inference of continued wrongdoing" at Umberto's. Judge Haight noted that Robert Ianniello, the nominal owner of Umberto's, had not been convicted at the criminal trial, and that those who had been convicted had consented to an injunction barring them from involvement in the affairs of Umberto's. Thus, he concluded that absent a showing of continued skimming at Umberto's, the government had not shown a need for a receiver.
 
 
 5
 In response to Judge Haight's invitation to generate evidence of continued wrongdoing, the government began an investigation in April 1986, retaining Stewart Feigenbaum, a recognized expert in the field of restaurant management. He and his staff made numerous visits to Umberto's between April 30 and May 4, 1986, for the purpose of projecting Umberto's gross receipts. Feigenbaum concluded that a "conservative estimate of the yearly gross receipts of Umberto's Clam House is $1.3 million per year." Armed with Feigenbaum's projections, and with records produced by the defendants that showed that the reported annual gross receipts for Umberto's were $850,000 per year, or approximately $500,000 less than projected by the government expert, the government renewed its motion for a receivership on May 22, 1986.
 
 
 6
 During his deposition one day earlier, Robert Ianniello had refused, on fifth amendment grounds, to answer any questions about Umberto's, even though the government had stipulated that it would consent to an order limiting the use of the deposition to the instant case. Later, Matthew and Alfred Ianniello--and even Osbro Restaurant as a corporate entity--also asserted fifth amendment privileges and refused to respond to any government questions regarding Umberto's.
 
 
 7
 On June 3, 1986, Judge Haight declined to sign the government's proposed order to show cause why a receiver should not be appointed. Instead, he ordered discovery designed to unearth relevant facts with an eye toward deciding the government's motion, and on July 31, 1986, heard argument on the government's application. At this hearing, defendants requested a plenary, evidentiary hearing, which Judge Haight denied.
 
 
 8
 Approximately two months later, on September 30, 1986, Judge Haight granted the government's application for a receiver pendente lite. United States v. Ianniello, 646 F.Supp. 1289 (S.D.N.Y.1986). He based his decision on the record underlying the Ianniellos' criminal convictions, the expert testimony of Feigenbaum, and on the refusal of all defendants to answer any questions concerning the operation of the restaurant.
 
 
 9
 After receiving proposed orders from the parties setting forth the scope of the receivership, Judge Haight entered an order that gave the receiver somewhat less discretion in running Umberto's than the government had sought, but significantly more authority than defendants proposed. The order gave the receiver, John C. Sabetta, "sole and exclusive control over the affairs of [Umberto's]", but it limited his power to fire employees, and did not give him title to the restaurant. See United States v. Ianniello, Memorandum Opinion, 86 Civ. 1552 (S.D.N.Y. Nov. 14, 1986).
 
 
 10
 Defendants' motion for a stay pending appeal was denied by a unanimous panel of this court on December 4, 1986. A month later, defendants obtained a stipulation and order permitting them to withdraw their appeal without prejudice to renewal within 60 days.
 
 
 11
 On February 20, 1987, defendants moved by order to show cause in the district court to vacate the receivership. They claimed that the financial affairs of Umberto's under the receiver had deteriorated to the point that the restaurant was on the verge of insolvency, and that experience under the receiver had demonstrated that the inference of continued skimming of the profits at Umberto's was unjustified. Shortly after a hearing on the defendants' motion, which can charitably be said to have gone poorly for them, defendants withdrew the motion and reinstated their appeal from the original order imposing the receivership.
 
 DISCUSSION
 
 12
 We address first the merits of Judge Haight's decision to impose the receivership, and then turn to his simultaneous decision to impose the costs of the receivership on the government pending trial.
 
 
 13
 A. The Appointment of a Receiver.
 
 
 14
 The defendants challenge both the appointment of the receiver and the breadth of his powers. They claim first that the district court erred in failing to hold an evidentiary hearing before appointing the receiver, and second that the evidence was inadequate to justify the extraordinary step of appointing a receiver. We reject each of these challenges.
 
 
 15
 First, we see no reason why the district court needed to hold a plenary hearing on the government's application. All defendants--including the corporate defendant Osbro Restaurant, Inc.--had made clear that they would refuse to answer any questions regarding the operation of Umberto's. When asked by the district court what evidence he would introduce at a hearing, defense counsel gave no satisfactory response, arguing only that the defendants' refusal to answer questions did not justify a negative inference. As Judge Haight said, "[I]f defendants are justified in their refusal to testify or produce additional information * * *, it is difficult to see how much a plenary trial will add. Defendants make no concrete offers of proof." Ianniello, 646 F.Supp. at 1300 n. 2.
 
 
 16
 We can readily agree with the general observations offered by defendants that a receivership "is an extraordinary remedy to be employed with the utmost caution", SEC v. Republic National Life Insurance Co., 378 F.Supp. 430, 438 (S.D.N.Y.1974), and that an evidentiary hearing should normally precede the granting of temporary injunctive relief, at least where there are disputed issues of fact, see Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867, 872 (2d Cir.1971). Here, however, Judge Haight proceeded with an abundance of caution; twice he declined to appoint a receiver and urged development of a fuller factual record. He gave defendants ample opportunity to rebut the government's case, including deposing the key government expert, Feigenbaum, presenting their own experts, and arguing extensively the merits of the receivership application. We conclude that it was not an abuse of discretion to refuse to hold a plenary hearing. See Herbert Rosenthal Jewelry Corp. v. Grossbardt, 428 F.2d 551, 554-55 (2d Cir.1970) ("not every application for a preliminary injunction require[s] an evidentiary hearing"); Redac Project 6426, Inc. v. Allstate Insurance Co., 402 F.2d 789, 790-91 (2d Cir.1968); cf. SEC v. Frank, 388 F.2d 486, 490 (2d Cir.1968) ("In many instances * * * [t]he taking of evidence would serve little purpose * * *."). While in Frank the court referred to a lack of "serious dispute about the facts" as obviating the need for a hearing, its rationale is equally valid where, as here, it is unlikely that a hearing will provide the district court with any additional information.
 
 
 17
 Second, the record before the district court was sufficient to justify a receivership. The evidence underlying the convictions of Matthew and Alfred Ianniello, the study and conclusions of government expert Feigenbaum, and the refusal of the defendants to answer any questions--all of which the district court properly considered--collectively provided strong evidence of continued skimming of Umberto's profits, and it was therefore not an abuse of discretion for Judge Haight to appoint a receiver. See Doran v. Salem Inn, 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975) (imposition of temporary injunctive-type relief subject to abuse of discretion review); Meineke Discount Muffler Shops, Inc. v. Noto, 603 F.Supp. 443, 444 (E.D.N.Y.1985) (" 'The appointment of a receiver pendent lite lies in the discretion of the Court * * *.' " (quoting Republic National Life Co., 378 F.Supp. at 438)); Guy v. Citizens Fidelity Bank and Trust Co., 429 F.2d 828, 833-34 (6th Cir.1970) ("[A]ppointment of receivers in order to protect property * * * is within the sound discretion of the District Judge."); 7 Moore, Federal Practice p 66.05 at 1920.1-20.2 & n. 2a (2d ed. 1986).
 
 
 18
 The defendants argue that it was improper for the district court to give "preclusive effect" to the criminal convictions of Matthew and Alfred Ianniello, since Robert Ianniello, the sole record owner of Umberto's, was acquitted in the criminal prosecution. It is clear that Judge Haight did not do so. Rather, he treated the criminal case simply as evidence--albeit strong evidence--of past skimming at Umberto's, and as therefore helping to establish in the civil trial that skimming had gone on. Quite properly, the convictions--or more accurately, the record underlying the convictions--were considered as probative of whether Robert Ianniello was unable or unwilling to prevent the skimming, and thus made stronger the government's case for a temporary receiver. It was therefore not error to consider the criminal proceeding.
 
 
 19
 Nor did the district court rely solely on the fact of past skimming at Umberto's; initially, it denied the government's motion for appointment of a receiver and required the government to produce evidence of continuing skimming. So prompted, the government commissioned the Feigenbaum study, which concluded that there was an approximate $500,000 difference between the receipts that the restaurant could be expected to generate and those actually reported in tax returns and other corporate documents discovered by the government. Defendants offered no estimate of their own, but rather simply attacked the weight to be attached to Feigenbaum's conclusions.
 
 
 20
 There was no abuse of discretion in according substantial weight to this study. Judge Haight did not simply adopt wholesale what Feigenbaum said; indeed, he rejected significant parts of the projections, including the estimate of Umberto's cost-sales ratio, and accepted the rest partially because it was "significantly corroborated by other evidence in the record." Ianniello, 646 F.Supp. at 1296. Since it was not error to consider Feigenbaum's findings, we will not second-guess the exact weight or significance given to them by the district court, which was acting in an area committed to its discretion.
 
 
 21
 Finally, the court permissibly drew a negative inference from the refusal of any of the defendants to answer questions relating to the operation of Umberto's. In the civil context, such a negative inference does not violate the fifth amendment, Baxter v. Palmigiano, 425 U.S. 308, 318-19, 96 S.Ct. 1551, 1557-58, 47 L.Ed.2d 810 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"), and the district court correctly concluded that "the case at bar is civil in nature". Ianniello, 646 F.Supp. at 1298, citing United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 326, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318 (1961) (fact that divestiture is an ultimate remedy does not render proceeding criminal) and United States v. Cappetto, 502 F.2d 1351, 1357 (7th Cir.1974) (civil proceeding "is not rendered criminal in character by the fact that the acts also are punishable as crimes").
 
 
 22
 Defendants' attack on the breadth of the receivership need not detain us long. In 18 U.S.C. Sec. 1964 congress empowered district courts "to prevent * * * violations of section 1962 by issuing appropriate orders, * * * ordering dissolution or reorganization of any enterprise * * * ", Sec. 1964(a), and "to enter such restraining orders or prohibitions, or take such other actions * * * as it shall deem proper," Sec. 1964(b). Under these sections, the district court has considerable discretion to frame the scope of a receivership to meet the needs of the case. Cf. View Crest Garden Apartments, Inc. v. United States, 281 F.2d 844, 849 (9th Cir.1960) ("It having been determined that appointment of a receiver * * * is proper, sensible administration may require that the receiver be given the additional power to manage the property * * * "). The evidence supports the conclusion that a receiver with powers limited to monitoring the affairs of Umberto's would be ineffective in preventing skimming. The receiver himself stated, in response to Judge Haight's questioning at the hearing on defendants' aborted motion to vacate the receivership, that "there is a powerful suggestion in the documents that we have recently analyzed and reported on to the court that some skimming was going on in 1986", after the district court had ordered monitoring of the financial affairs of Umberto's. Even without considering the information garnered after the receiver assumed his duties, it is clear that the district court had sufficient reason to believe skimming was continuing at Umberto's despite the court-ordered monitoring. For example, the district court had continued an order, entered by Judge Weinfeld in the criminal case, requiring Osbro to "submit * * * on a monthly basis certain financial records relevant to its operations." 646 F.Supp. at 1293. These records showed that gross receipts at Umberto's continued to average less than $75,000 per month at least through March, 1986, long after Judge Weinfeld had ordered monitoring of Umberto's affairs. Id. A receiver with broad authority to operate the restaurant was therefore a reasonable means of bringing to an end the skimming at Umberto's.
 
 
 23
 B. The Costs of the Receivership.
 
 
 24
 On its cross-appeal, the government argues that it should not have been assessed the costs of the receivership "in the first instance * * * without prejudice to an application by the Government at the time of final judgment, should the Government prevail, to have [the costs] taxed against one or more of the defendants." Ianniello, 646 F.Supp. at 1300. We reject the government's contention.
 
 
 25
 We note at the outset that we have pendent appellate jurisdiction over what would normally be a nonappealable, interlocutory decision of the district court. See San Filippo v. U.S. Trust Co. of New York, Inc., 737 F.2d 246, 255 (2d Cir.1984) ("once we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well"). Here, the issues of the appointment of a receiver and of where to assess his costs, even though the latter is technically raised on the government's cross-appeal rather than on the defendants' appeal, are sufficiently intertwined to justify addressing them simultaneously.
 
 
 26
 The purpose of appointing the receiver, as distinguished from that of the underlying litigation, is limited to preventing skimming from Umberto's profits during the pendency of the litigation. The major point of the skimming, according to the government, was to avoid taxes due on Umberto's sales and profits. By ensuring that the true receipts are reflected on Umberto's books, the receiver will, presumably, cause the taxes paid by the corporate entity to increase. Since the benefit of the receivership is thus enjoyed by the public, it seems appropriate at this stage to impose the costs of the receivership on the government, at least pending a resolution of its charges against the defendants. If it is established that Umberto's as a corporate entity has benefited from the receivership, it might then be appropriate to reimburse the government for some, or perhaps all, of the expenses of the receiver. That is a question, however, whose answer awaits the outcome of the underlying litigation.
 
 
 27
 After oral argument in this case we received a letter from the government, presenting additional argument in an attempt to "clarify" a point made by counsel for defendants during the argument. Such letters are not authorized by the Federal Rules of Appellate Procedure, see Fed.R.App.P. 28(j) (authorizing post-argument letters limited to calling to court's attention "pertinent and significant authorities [that have] come to the attention of a party * * * after oral argument but before a decision" and requiring such letters to be "without argument"). Accordingly, we have given no consideration to the letter.
 
 
 28
 The order appealed from is affirmed.