934 F.2d 1180
 20 Fed.R.Serv.3d 284, 33 Soc.Sec.Rep.Ser. 521,
Unempl.Ins.Rep. CCH 16184A
 CITRONELLE-MOBILE GATHERING, INC., Citmoco Services, Inc.,
Plaintiffs-Counterclaim-Defendants,
Bart B. Chamberlain, Jr., Plaintiff-Counterclaim-Defendant-Appellant,
v.
James D. WATKINS, etc., et al., Defendants-Appellees,
United States of America, Defendant-Counterclaim-Plaintiff-Appellee,
Douglas Oil Purchasing Company, Inc.,
Counterclaim-Defendant-Appellant (two cases).
 Nos. 90-7191, 90-7375.
 United States Court of Appeals,
Eleventh Circuit.
 June 27, 1991.
 
 Victor T. Hudson, William W. Watts, Reams, Vollmer, Philips, Killion, Brooks & Schell, P.C., Mobile, Ala., for appellants.
 Bart B. Chamberlain, Jr., pro se.
 Gilbert T. Renaut, Office of Chief Counsel for Enforcement, Economic Regulatory Admin., Dept. of Energy--RG-33, Washington, D.C., for Dept. of Energy.
 Ruth A. Harvey, U.S. Dept. of Justice, Washington, D.C., J.B. Sessions, U.S. Atty., Mobile, Ala. for U.S.
 
 
 1
 William Gray Schaffer, Preston Gates Ellis & Rouvelas, Meeds, Washington, D.C., for Intevenors Howard Pack and Susan Rosenkranz.
 
 
 2
 Appeal from the United States District Court for the Southern District of Alabama.
 
 
 3
 Before KRAVITCH and ANDERSON, Circuit Judges, and LYNNE*, Senior District Judge.
 
 LYNNE, Senior District Judge:
 
 4
 This appeal considers issues raised in two separate actions, 90-7191, and 90-7375, resulting from the entering of two orders by the District Court for the Southern District of Alabama. The first order appealed from established a permanent receivership over appellants' assets and the second allowed garnishment of one of the bank accounts of the individual appellant. Since each of the cases arises from the same set of facts, the issues on appeal are considered together. Appellants' consolidated appeal asks this court to determine its jurisdiction and then to review four decisions of the district court: (1) whether this court, rather than the Temporary Emergency Court of Appeals, properly has jurisdiction over this appeal; (2) whether the district court-appointed receiver may reach appellants' assets located abroad; (3) whether the court's appointment of the receiver was proper as a procedural matter; (4) whether the court's appointment of the receiver was proper regarding the substance of the powers granted him; and (5) whether the district court erred in allowing the garnishment of certain funds held in a bank account in the name of appellant Chamberlain. We find that this court has jurisdiction over this appeal, and we affirm each decision of the district court.
 
 
 5
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 
 
 6
 Between December of 1973 and April of 1974, during the Arab oil embargo, Bart B. Chamberlain, one of the appellants in this case, agreed to sell nearly a million barrels of crude oil consisting of four separate shipments to one "PETCO," the wholly-owned Bahamian subsidiary of an American corporation, "NEPCO," for $13 and $14 per barrel at a time when price controls would have set a maximum price for this oil at $4.10 to $5.10 per barrel. Export license regulations established by the Department of Commerce in response to the embargo, 15 C.F.R. Sec. 377.6(b)(i), required Chamberlain's companies, appellants Citronelle-Mobile Gathering, Inc. ("Citronelle"), 90% owned by Chamberlain, and Citmoco-Mobile Services, Inc. ("Citmoco"), 87.5% owned by Chamberlain, to certify that the total quantity or quality of petroleum available to the United States would not be reduced by its sales to PETCO. Appellants complied by submitting affidavits stating that all the oil being shipped to the Bahamas was to be purchased by NEPCO and exported back to the United States. The licenses were granted.
 
 
 7
 The Department of Energy investigated these Bahamian oil sales, prompting appellants to bring an action for a declaratory judgment to enjoin the investigation. Appellants argued that the sales at issue were exports subject to an exception (under 10 C.F.R. Sec. 211.1 and Sec. 212.53) from the rigid sales and pricing regulations set on domestic oil sales pursuant to the Emergency Petroleum Allocation Act, 15 U.S.C. Sec. 751, et seq. The district court trying the declaratory judgment action disagreed, and that court found violations of price control regulations 6 C.F.R. Part 150 and 10 C.F.R. Part 212, and ordered restitution. Citronelle-Mobile Gathering, Inc. v. O'Leary, 499 F.Supp. 871, 881-888 (1980).
 
 
 8
 Chamberlain, Citronelle, and Citmoco appealed the district court decision to the Temporary Emergency Court of Appeals. That court affirmed the lower court's holding that appellants' oil sales to the Bahamian buyer were not export sales and thus were not exempt from the regulations fixing ceilings on oil prices. Citronelle-Mobile Gathering, Inc. v. Edwards, 669 F.2d 717, 719-721 (Temp.Emer.Ct.App.1982). The court also remanded to the district court to determine the amount of restitution and to establish a plan to distribute those funds to buyers who were overcharged. Id. at 723.
 
 
 9
 On remand the district court decided that the amount of restitution owed by appellants should be reduced by the amount of state and federal taxes paid, and also that Chamberlain's personal liability should be limited to the amount of money he actually received from the oil sales. Both sides appealed this determination to the Temporary Emergency Court of Appeals.
 
 
 10
 On that appeal, the Temporary Emergency Court held that the district court erred in three ways: (1) by subtracting from the restitutionary amount the state and federal taxes paid by appellants; (2) by applying a flat 6% interest rate on the restitutionary amount instead of a schedule of quarterly interest rates beginning in 1974 which more accurately reflected the value of the money during the time held by Chamberlain, Citronelle, and Citmoco; and (3) by not holding Chamberlain personally liable for the full amount of restitution ordered. Citronelle-Mobile Gathering, Inc. v. Herrington, 826 F.2d 16 (Temp.Emer.Ct.App.1987), cert. denied, 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987). The court remanded to the district court once again to oversee the distribution of the restitutionary amount, totaling over $25 million.
 
 
 11
 Appellees encountered difficulty in collecting the judgment amount, and upon post-judgment discovery pursuant to Rule 69, appellees learned that Chamberlain had transferred assets from Citronelle and Citmoco, rendering them mere shells, to the previously dormant "Douglas Oil", a subchapter S corporation 100% owned by Chamberlain, and also that Chamberlain had funnelled millions of dollars out of the United States through the Bahamian corporation owned by Chamberlain and his wife, "Douglas Trading". Appellees moved for a temporary restraining order to prevent further impairment of assets out of which the judgment could be satisfied and also moved for leave to amend their complaint to include Douglas Oil and Douglas Trading under the theories of alter ego, piercing the corporate veil, or successor liability. The district court granted the TRO on September 28, 1989, against Chamberlain, Citronelle, Citmoco, Douglas Oil and Douglas Trading. On October 30, 1989, appellees filed a motion to compel the return of assets and to appoint a receiver to control the assets of Chamberlain, Citronelle, Citmoco, and Douglas Trading and to operate the business of Douglas Oil. On December 27, 1989, the court appointed an interim receiver over the assets of Chamberlain, Citronelle, and Citmoco. On February 14, 1990, the district court ordered the appointment of a permanent receiver over all the assets of Chamberlain, Citronelle, Citmoco, and Douglas Trading, as well as Chamberlain's 100% stock ownership of Douglas Oil. These are the essential facts of the case on appeal numbered 90-7191.
 
 
 12
 In addition to the collection actions taken in 90-7191, appellees have also sought recovery of the judgment against Chamberlain individually. In October, 1989, appellees initiated garnishment proceedings against Chamberlain's accounts at Southtrust Bank of Mobile. The court entered judgment on April 25, 1990, in favor of appellees, in the amount of $63,901.46. This outlines the essential facts of appeal numbered 90-7375.
 
 II. ISSUES AND ANALYSIS
 A. Jurisdiction
 
 13
 The government argues that the Temporary Emergency Court of Appeals has exclusive jurisdiction over this appeal since the case arises under the Economic Stabilization Act, 12 U.S.C. Sec. 1904. Section 211(b)(2) of that act provides:
 
 
 14
 Except as otherwise provided in this section, the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder.
 
 
 15
 The TECA's exclusive jurisdiction is limited to issues arising under the ESA or the EPAA: the issue on appeal must involve the construction, application, or effect of either the Economic Stabilization Act ("ESA") or the Emergency Petroleum Allocation Act ("EPAA"), and that construction, application or effect must have been determinative. Atlantic Richfield Co. v. U.S. Department of Energy, 769 F.2d 771, 778-779 (D.C.Cir.1984). The Temporary Emergency Court of Appeals has similarly decided that its appellate jurisdiction must be focused on the nature of the "issue presented" as opposed to the "nature of the case or controversy presented below." MPGC, Inc. v. Department of Energy, 673 F.2d 1277, 1281 (Temp.Em.Ct.App.1982).
 
 
 16
 Following the accepted rule that the nature of the issue(s) on appeal must be the focal point of analysis of TECA's appellate jurisdiction under 12 U.S.C. Sec. 1904 note Section 211(c), the question becomes whether or not the appellants' challenges of the appointment of the receiver and of the extent of his power over their assets are independent of the underlying ESA and EPAA violations which formed the basis of this suit.
 
 
 17
 Appellees characterize the issues on appeal as relating solidly to questions involving the EPAA, 15 U.S.C. Sec. 754(a)(1). Appellees view this appeal as a challenge of the district court's appointment of a receiver whose sole purpose is to enforce the judgment of the TECA, and they argue that that court should determine whether the appointment of a receiver and the actions he has taken were proper measures for enforcement of its final adjudication of the underlying EPAA violations. Appellees liken the receivership issues to the question of mootness as raised in Quincy Oil, Inc. v. Federal Energy Administration, 620 F.2d 890 (Temp.Em.Ct.App.1980), where the TECA found that the "continuing validity of a substantive claim or cause of action under adjudication ... has no life apart from that substantive claim." Id. at 893. They also contend that the appeal in Stertz v. Gulf Oil Corp., 783 F.2d 1064 (Temp.Em.Ct.App.1986), which was based on the argument that an injunction established as the result of an ESA action was overbroad, is comparable to the issues here. The TECA there determined that it had jurisdiction "to decide certain questions that do not 'arise independently of the substantive [ESA] claim or cause of action' and have no life apart from that substantive claim" (citing Quincy Oil ) and then decided that "the question of overbreadth of the injunction is not independent of the ESA issue upon which the injunction was initially based ... [and therefore] this court has jurisdiction ..." Stertz, 783 F.2d at 1069.[1]
 
 
 18
 However, appellants' liability for ESA and EPAA violations has already been fully litigated, and their appeal of the district court decision assessing the amount of restitution appellants must pay has already been decided in Citronelle-Mobile Gathering, Inc. v. Herrington, supra. There remains no question of liability based on those ESA and EPAA violations: all the issues on this appeal concern the post-judgment enforcement of the TECA decision. Appellees sought appointment of a receiver pursuant to F.R.Civ.P. 69 only after their efforts at collection of the judgment failed; his appointment was not sought by appellees nor intended by the district court to be an integral part of the remedy for the ESA and EPAA violations. Neither the Acts nor the regulations pursuant to them contain any provisions dealing with the appointment of a receiver or any other method of collection of judgments.
 
 
 19
 The decision in Bray v. United States, 423 U.S. 73, 75, 96 S.Ct. 307, 309, 46 L.Ed.2d 215 (1975), probably provides the greatest guidance here. The Supreme Court stated that "Review in the TECA of criminal contempt convictions relating to compliance investigations or enforcement efforts is not necessary to assure uniform interpretation of the stabilization scheme" (emphasis added). In Bray, the petitioner had requested a review of his conviction for criminal contempt for failure to comply with a subpoena requiring the production of records in an investigation of ESA violations. The Tenth Circuit had dismissed the appeal for want of subject matter jurisdiction; the Supreme Court reversed. The Court determined that the contempt charge was "a separate and independent proceeding at law" (citing Gompers v. Bucks Store and Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911)), and that requiring the TECA to hear the appeal "would only serve to undermine the prompt resolution of Stabilization Act questions ..." Bray, 423 U.S. at 75, 96 S.Ct. at 309. The appointment of and actions taken by the receiver here are purely matters of enforcement of an ESA/EPAA action; this court has jurisdiction over challenges to those measures taken to collect a judgment based on a finding of liability for ESA and EPAA violations which are not contested here.
 
 
 20
 B. The Receiver's Powers Over Foreign Assets
 
 
 21
 The district court's order of February 14, 1990, appointed the permanent receiver and granted him the following powers which appellants find objectionable:
 
 
 22
 4. The Receiver shall, in consultation with the United States, take all necessary steps to gather and take possession of the assets of Douglas Oil and to return to the United States assets located outside of this Court's jurisdiction. The Receiver shall take all necessary steps to obtain the return to the United States of assets held by Douglas Trading on behalf of Douglas Oil. As to assets such as real property which cannot economically or practicably be returned to the United States, the Receiver shall, in consultation with the United States, sell those assets in a commercially reasonable manner and return the funds to the United States.
 
 
 23
 5. The Receiver shall, in consultation with the United States, take all possible steps to gather and take possession of the assets of Chamberlain, Citronelle-Mobile Gathering and Citmoco Services, and to return to the United States the assets located outside of this Court's jurisdiction. The Receiver shall take all necessary steps to obtain the return to the United States of assets held by Douglas Trading on behalf of Chamberlain. As to assets such as real property which cannot economically or practicably be returned to the United States, the Receiver shall, in consultation with the United States, sell those assets in a commercially reasonable manner and return the funds to the United States.
 
 
 24
 * * * * * *
 
 
 25
 13. The Receiver is authorized and directed to obtain information relating to all financial accounts, real property and personal assets in the name of or held for the benefit of Douglas Oil, Citronelle-Mobile Gathering, Citmoco Services, Chamberlain and Douglas Trading, within this Court's jurisdiction and abroad, and to provide this information to the United States.
 
 
 26
 14. The Receiver shall have signature authority over and ownership of the financial accounts of Douglas Oil, Citronelle-Mobile Gathering, Citmoco Services, Chamberlain and Douglas Trading, wherever situated.
 
 
 27
 Appellants take the position that federal law grants no powers to receivers beyond the borders of the United States. They cite Booth v. Clark, 17 How. (58 U.S.) 322, 15 L.Ed. 164 (1854), and Great Western M & M Co. v. Harris, 198 U.S. 561, 25 S.Ct. 770, 49 L.Ed. 1163 (1905), in order to illustrate the restrictive scope the courts have traditionally applied to the powers of receivers and the inclination of the courts to defer to explicit legislative expansion of receivership powers. Appellants trace the development of a receiver's power to act not only within the district of the appointing court as in Booth v. Clark, supra, but ultimately to be empowered to act within any district of the United States under F.R.Civ.P. 17(b) and 66, as support for the argument that the territorial sweep of receiver's powers has been broadened only sparingly over the decades and that, in the absence of an express grant of authority from Congress, this court should not and could not find that a federal receiver's territorial scope may extend to assets located abroad.
 
 
 28
 In their second argument, appellants contend that, even if Congress intended to bestow upon a receiver the power to act extra-territorially, that power is void under the principles of international law. Once again appellants build their argument from an historical foundation: "the jurisdiction of the nation within its own territory is necessarily exclusive and absolute ... All exceptions, therefore, to the full and complete power of a nation, within its own territories, must be traced up to the consent of the nation itself." The Exchange, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812) (quoting Chief Justice Marshall). Appellants then draw the conclusion that one of the aspects of this necessarily exclusive jurisdiction is exclusive control over assets situated within a given country, and the nullity of any enforcement action taken as of right in a foreign state. The appellants argue that the district court's order of February 14, 1990, is based not on the court's in personam jurisdictional power over the defendants, but instead consists of an illegitimate expansion of in rem jurisdiction because the terms of the February order expressly give the receiver the right to immediate possession and control of appellant's assets.
 
 
 29
 While appellees oppose both the appellants' arguments on this issue, they agree that a receiver may not act in disregard for the laws of the foreign state in which the judgment debtor's assets are located. However, they contend that the order granting the receiver's powers does not attempt to empower him to disregard foreign laws and his appointment and employment of his court appointed powers to enforce the court order are proper exercises of the district court's in personam jurisdiction over the appellants.
 
 
 30
 The starting place in deciding this question must be F.R.Civ.P. 66 itself:
 
 
 31
 An action wherein a receiver has been appointed shall not be dismissed except by order of the court. The practice in the administration of estates by receivers or other similar officers appointed by the court shall be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the district courts. In all other respects the action in which the appointment of a receiver is sought or which is brought by or against a receiver is governed by these rules.
 
 
 32
 This language neither expressly establishes nor expressly prohibits a receiver's powers in foreign situations. Reviewing the applications of the federal receivership statute in the case law provides greater guidance. The rule which emerges from such a review appears to be this: when a district court has in personam jurisdiction over the defendant, (1) the court may appoint a receiver to enforce a judgment upon a showing that such an appointment is necessary (see Section C, infra, on this point) and (2) such a duly appointed receiver may exercise authority over any assets located in foreign countries provided that his actions are taken in accord with or otherwise do not violate the law of that foreign nation. Given the issues on appeal in this case, this court will examine the second part of the above rule first to review whether the appointment of the receiver was theoretically possible. In the next section we will turn to the issue contained in the first part: that is, if the court did indeed have the power to appoint a receiver over appellants' assets, is the receiver's authority nevertheless invalid due to the court's appointing him improperly.
 
 
 33
 The case law establishing that a federal receiver may reach foreign assets is relatively clear: "Personal jurisdiction gave the court power to order [the defendant and I.R.S. jeopardy assessment debtor] to transfer property whether that property was within or without the limits of the court's territorial jurisdiction." United States v. Ross, 302 F.2d 831, 834 (2d Cir.1962) (citations omitted). Similarly in United States v. Arizona Fuels Corporation, 739 F.2d 455 (9th Cir.1984), an Arizona district court's personal jurisdiction over the defendant was sufficient to uphold a receiver's power to assert authority over defendant's property in the Southern District of Texas despite the receiver's non-compliance with the requirements of 28 U.S.C. Sec. 754. See also, American Freedom Train Foundation v. Spurney, 747 F.2d 1069, 1073-1074 (1st Cir.1984). While Arizona Fuels dealt only with a receiver's authority as between the district of his appointment and the separate district where assets were located, the rationale for upholding the legitimacy of the receiver's actions applies equally to a situation whether the assets happen to be in another nation, not merely another district.
 
 
 34
 Regarding receivership powers in conflict with foreign laws the case law is no less clear: " 'A state can exercise jurisdiction through its courts to make a decree directing a party subject to the jurisdiction of the court to do an act in another state, provided such act is not contrary to the law of the state in which it is to be performed.' " Securities and Exchange Commission v. Minas De Artemisa, S.A., 150 F.2d 215, 217 (9th Cir.1945) (quoting Restatement of Conflict of Laws Sec. 94). There the court found that its personal jurisdiction over defendant corporation empowered it to order production of documents located in Mexico, provided no Mexican law prohibited such production. United States v. Ross, supra, in addition to standing for the proposition that a federal receiver may exert authority over assets located abroad, also establishes that the limits of that receiver's authority extend all the way to the point at which a conflict exists with the laws of the country where the assets are located. Even where a conflict or potential conflict exists, the power of the receiver is not voided, but instead the appointing court's order should be modified so as to remove the conflict. Ross, 302 F.2d at 834.
 
 
 35
 Federal Trade Commission v. Compagnie De Saint-Gobain-Pont-A-Mousson, 636 F.2d 1300 (D.C.Cir.1980), cited by appellants, is completely in line with this analysis. The court there rejected an interpretation of a Congressional statute which would have allowed the Federal Trade Commission to serve its investigatory subpoena directly upon foreign citizens by certified mail; instead it determined that the statute should be interpreted to allow the F.T.C. to serve process only in "those customary and legitimate methods" employed at home. Id. at 1307. In that case the subpoena had been served directly upon a foreign citizen by registered mail, thus the court did not reach the international conflict issue. However, in a footnote, the court addressed the appropriate analysis had the subpoena been properly served. The court noted that two questions would then need to be considered: first, whether a French statute which prohibited the production of the documents subpoenaed would apply, and, second, whether or not the defendant corporation "had made good faith efforts to secure the permission of the French Government to produce the documents despite the French statute ..." Id. at 1326, n. 148 (emphasis added). Thus even if a potential conflict was presented, the court would consider whether or not that potential conflict would ripen into a real one: there the defendant would have had to have shown that the French Government indeed would not have allowed him to produce the documents.
 
 
 36
 In the case before the court, it is undisputed that the district court has in personam jurisdiction over the defendant, thus the receiver could be empowered to reach foreign assets. And since appellants have made no showing that the February, 1990, order violates Bahamian law, we need not consider whether that order requires modification or invalidation.
 
 C. The Appointment of the Receiver
 
 37
 Having established whether or not the receiver's authority may extend to foreign assets, it is still incumbent upon this court to determine whether or not the process by which he was appointed was proper.
 
 
 38
 Appellants cite Securities and Exchange Commission v. Spence & Green Chemical Company, 612 F.2d 896, 904 (5th Cir.1980), for the proposition that "the imposition of a receivership on a corporation is a drastic measure, the detrimental business effects of which should be carefully considered." Appellants also rely on Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867 (2d Cir.1971), for the idea that careful consideration means that an evidentiary hearing should have been held, and that the district court's refusal to hear the testimony of Don Smith amounted to reversible error.
 
 
 39
 While appellants are correct as to the fact that the district court should have considered the potential harms to the parties, the record reflects that the court considered this factor and found that "the potential harm to the United States by denial of the motion outweighs any harm to the parties opposing the receivership." Findings of Fact and Conclusions of Law, January 3, 1990, at 7. Appellants' reliance on Carter-Wallace for the requirement of a hearing is misplaced for several reasons, the strongest of which is that in that case the district court was considering the granting of a preliminary injunction while here the court was considering the execution of a judgment which had been fully adjudicated on the merits. Another salient distinguishing factor in Carter-Wallace is based on the particular nature of that action--a suit for an injunction to restrain the defendant from an alleged patent infringement. In reversing the district court's granting of the injunction, the Second Circuit cited the rule that "a patentee seeking a preliminary injunction against infringement [bears] a burden [so] substantially heavier than the usual ones of showing irreparable injury and probability of success" that failure to hold an evidentiary hearing constituted reversible error. Id. at 871-872. In contrast, here the probability of success had already been completely established by a judgment on the merits and, as mentioned above, the showing of irreparable injury had been reviewed and found to weigh in the appellees' favor.
 
 
 40
 Contrary to the particular situation of the granting of a preliminary injunction in a patent infringement case, there is no general requirement of a hearing in Rule 66, and the court may approve of the appointment of a receiver without a hearing where the record discloses sufficient facts to warrant it. United States v. Mansion House Center North Redevelopment Corp., 419 F.Supp. 85 (E.D.Mo.1976) (citing Bookout v. Atlas Financial Corp., 395 F.Supp. 1338 (N.D.Ga.1974), aff'd 514 F.2d 757 (5th Cir.1975), and Haase v. Chapman, 308 F.Supp. 399 (W.D.Mo.1969)). The Bookout and Haase decisions are perhaps even more instructive on this issue. The Bookout court followed the Haase court in ordering the appointment of a receiver. "Basically, the Haase case was an effort to collect on a judgment." Bookout, 395 F.Supp. at 1342. The court continued, "although this court has not conducted an evidentiary hearing regarding [appointment of a receiver], when the files and records of a case, together with the pleadings, briefs and uncontroverted assertions of the parties show that appointment of a receiver is warranted, an evidentiary hearing is not required." Id., citing Haase, 308 F.Supp. at 406. This line of reasoning is even more persuasive in this context, where the situation was not merely comparable to a collection on a judgment but indeed was a collection on a judgment. See also, United States v. Ianniello, 824 F.2d 203 (2d Cir.1987) (no hearing required for court to appoint a receiver to ensure the collection of taxes). The court had more than enough evidence of the divergence and depletion of appellants' assets to support its determination that no evidentiary hearing was required and that a receiver should be appointed. Findings of Fact and Conclusions of Law, January 3, 1990, at 2-7. Especially in light of the egregious nature of appellants' actions, the district court's denial of an evidentiary hearing clearly did not constitute reversible error.
 
 D. The Extent of the Receiver's Power
 
 41
 Appellants raise two arguments regarding the allocation and extent of powers given to the receiver: (1) whether or not the court erred in giving the receiver the power over the assets of Douglas Oil, and (2) whether the receiver could take possession of Chamberlain's stock interest in Douglas Oil without physically taking possession of the stock.
 
 
 42
 Appellants rely on Piambino v. Bailey, 757 F.2d 1112 (11th Cir.1985), for the proposition that a party seeking receivership must have a "legally recognized right in [the] property [he wishes to seize] that amounts to more than a mere claim against defendant." Id. at 1131, n. 46 (citing 12 C. Wright & A. Miller, Federal Practice and Procedure, Sec. 2983 (1973)). Appellants contend that the government has no more than a "mere claim" against Douglas Oil and that the court extended authority over those assets in error.
 
 
 43
 Appellees maintain that the receivership's authority over Douglas Oil assets is proper based on the final judgment obtained against Chamberlain, Gathering, and Services, from which trial court has determined that the assets of Douglas Oil have been derived. Findings of Fact and Conclusions of Law, January 3, 1990, at 3. These conveyances from Chamberlain, Gathering, and Services being in the nature of fraudulent conveyances, the court may look past the form of the transaction and instead apply its order to the substance. See, e.g., Levin v. Garfinkle, 514 F.Supp. 1160, 1163 (E.D.Penn.1981). Appellees further maintain that the appointment of a receiver to protect the assets of defendant from dissipation pendente lite is also within the scope of the court's authority under Rule 66. See, e.g., Mansion House, supra; Bookout, supra; Haase, supra. Finally, appellees also point out that the February 14, 1990, order directs the receiver to take control over Chamberlain's stock interest in Douglas Oil:
 
 
 44
 1. As Receiver over Chamberlain's interest in one hundred percent (100%) of the stock of Douglas Oil Purchasing Company, Inc. ("Douglas Oil"), the Receiver shall assume all of the rights Chamberlain enjoyed incident to his stock ownership. This includes, but is not limited to, the power to vote such stock for all purposes without the transfer thereof into his own name, as necessary to manage and control Douglas Oil as described hereinafter, and to assume all of Chamberlain's rights and authority as President and Chairman of the Board of Douglas Oil. The Receiver's authority over Douglas Oil is limited to and derived from his assumption of Chamberlain's stock interest in that company.
 
 
 45
 It is incontestable that the receiver had authority over Chamberlain's assets pursuant to the judgment against him. While the fact that he is the sole shareholder may be subjecting Douglas Oil, in effect, to the complete control of the receiver, nothing in the law of receivership limits the amount of control a receiver may wield in a corporation as a result of becoming the receiver of a sole stockholder.
 
 
 46
 Even if the receiver could take over control of Douglas Oil stock, appellants contend that his attempt to effectuate such control was inadequate since he did not take physical possession of the stock certificates as required under Alabama Code Sec. 7-8-317.[2] The policy behind Sec. 7-8-317, protecting good faith purchasers from superior claims of levying or attaching creditors, would be undercut if receivers were exempted from its requirements. This policy must also be read into Alabama Code Sec. 10-2A-53,[3] which authorizes a receiver to vote stock without transfer of that stock into his name if his authority is contained in a court order, in order to understand that the manner in which a receiver may "hold" or "control" the stock must not violate the principle of protecting good faith purchases; i.e., the receiver must take physical possession of the stock.
 
 
 47
 This court declines to place such a strained construction on the Alabama statutes. The issue here is not levy or execution upon stock by an enforcing officer or judgment creditor, but rather the disposition of that stock by a receiver pursuant to a court order. Therefore, 10-2A-53 speaks more directly to the facts of this case, and thus its plain wording should control.[4]
 
 E. Garnishment of Chamberlain's Accounts
 
 48
 The final issues on appeal are all based on appellant Chamberlain's opposition to the garnishment of some $46,312.07 of the $63,901.46 paid into the Registry of the court pursuant to an order on April 25, 1990. First, Chamberlain claims that some $43,486.07 on deposit at Southtrust Bank of Mobile was exempt as wages under Alabama Code Sec. 6-10-7.[5] Second, Chamberlain claims that $2,826.00 of the same deposit was exempt due to the fact that they were Social Security benefits exempt under 42 U.S.C. Sec. 407.[6] Finally, Chamberlain claims that an affidavit submitted on April 6, 1990, in order to show that he was an Alabama resident at all material times and thus could claim the Alabama wage exemption, was improperly struck by the district court.
 
 
 49
 Each of appellants' contentions must fail. Alabama Code Sec. 6-10-7 provides an exemption for wages, salaries, or other compensation for personal services. Tracing the Southtrust account funds to their sources, we find that on September 14, 1989, Chamberlain received a check for $39,750 as a "salary" check for 999.99 hours of work on the same day that he received a regular bimonthly salary check. The district court determined that this payment was a lump sum and not a "periodic payment ... needed to support the wage earner and his family on a week-to-week, month-to-month, basis." Kokoszka v. Belford, 417 U.S. 642, 651, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). Three other checks from Douglas Oil to Chamberlain make up the remainder of the non-Social Security amounts at issue in the account. Although these were made on a periodic basis, they were arguably not for personal services to benefit Douglas Oil.
 
 
 50
 Even if these other three checks were for personal services, once commingled with other funds, they lost any exempt status that they may have had. The Ninth Circuit followed the reasoning of Kokoszka in determining that "a bank account has neither an element of periodicity nor the critical relationship to a person's subsistence that a paycheck does" and therefore funds deposited in a bank account, including paychecks, were held to be subject to garnishment. Usery v. First National Bank of Arizona, 586 F.2d 107 (9th Cir.1978). The Ninth Circuit's reasoning applies equally well here, where Chamberlain admittedly left for Switzerland with over $10 million and has not had to rely on any of the sums deposited in his account for support for himself and his family.[7]
 
 
 51
 Chamberlain's claim of exemption for his Social Security payments from garnishment is supported by the express language of 42 U.S.C. Sec. 407. Chamberlain's brief cites four cases interpreting this provision to void the garnishment of Social Security payments. However, the facts in each of these cases are far more compelling than the facts of this case. In Harris v. Bailey, 675 F.2d 614, 615 (4th Cir.1982), the recitation of facts included the statement that "the checking account garnisheed [sic] ... contained Social Security benefits received by Mrs. Harris; Social Security being her only source of income." Finberg v. Sullivan, 634 F.2d 50, 51 (3d Cir.1980), is similar: "The appellant, Mrs. Beatrice Finberg, is a 68-year-old widow whose sole source of income is Social Security retirement benefits." In Tidwell v. Schweiker, 677 F.2d 560, 563 (7th Cir.1982), the plaintiff class was made up of institutionalized mental patients whose Social Security benefits were being automatically paid to the state under a statutory scheme. And finally, in Philpott v. Essex, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973), the State of New Jersey was seeking reimbursement of disability benefits paid to a Social Security recipient who had no other income.
 
 
 52
 Chamberlain's situation starkly contrasts with the compelling situations just described. Chamberlain's trying to protect some twenty three hundred dollars which had been deposited in an account containing $63,000 which has been heavily drawn on is enough to distinguish it from the cases cited above. But once one considers the facts that Chamberlain has sole control over corporate assets of over $10 million and has managed to flee to Switzerland, his attempts to protect this small amount of funds appear almost ridiculous. A brief scan of Chamberlain's list of assets makes clear that the Social Security funds at issue will not mean the difference between desperation and subsistence. To protect these Social Security payments of $2,826.00 which had been deposited into an account with tens of thousands of other dollars would make a mockery of the purposes of the Social Security payments in general as well as the protections of them provided by Sec. 407.
 
 
 53
 Instead, this circuit's reasoning in United States v. Devall, 704 F.2d 1513, 1516-1517 (11th Cir.1983), should be applied to the facts of this case. There the court interpreted the purposes of 42 U.S.C. Sec. 407 and found that "section 407 attempts to insure that recipients have the resources necessary to meet their most basic needs. [citations omitted] ... However, when the debtor's ability to care for himself or herself is not implicated, Section 407 need not be applied. E.g., In re Treadwell, 699 F.2d 1050 (11th Cir.1983)." Finding that "the assignment of funds to the trustee will not affect the recipient's ability to secure basic care and maintenance," the Devall court determined that Social Security funds were due to be paid over to a trustee in bankruptcy. While that court was construing Sec. 407 in light of the conflicting bankruptcy provisions of 11 U.S.C. Sec. 541(a)(1) the fact pattern in this case renders its rationale appropriate. In Department of Health and Rehabilitative Services, State of Florida v. Davis, 616 F.2d 828, 830 (5th Cir.1980) the predecessor to this court distinguished Philpott v. Essex and allowed the State of Florida reimbursement for care provided to a mental incompetent even though that reimbursement was obtained from funds "derived [only] from Social Security and veterans' payments." In determining that Sec. 407 did not prevent such reimbursement, the court based its holding on the purpose underlying Social Security payments and statutory protections.
 
 
 54
 The purpose of social security benefits for the disabled is to provide for their care and maintenance. The purpose of the Social Security exemption is to protect social security beneficiaries from creditor's claims ... this exemption evinces a clear legislative purpose of precluding beneficiaries from diverting their social security payments away from the statute's seminal goal of furnishing financial, medical, rehabilitative and other services to needy individuals. 42 U.S.C.A. Sec. 301. Neither the purpose of the benefits, nor the purpose of the exemption, is accomplished by barring Florida from reimbursement.
 
 
 55
 Id. at 831. Thus, this circuit has implied an exception to 42 U.S.C. Sec. 407 when the reaching of Social Security benefits is not going to impair the ability of the recipient to satisfy his or her basic needs. Following this circuit's analysis, then, the facts of this case clearly support garnishment of Chamberlain's Social Security payments.
 
 
 56
 Given that our holding that Chamberlain was not entitled to the exemption provided by Alabama Code Sec. 6-10-7 rested on the nature of the funds sought to be protected rather than on a holding that the exemption was not available to him for failing to establish his residency of the State of Alabama, we do not reach the question of the propriety of the district court's striking of Chamberlain's April, 1990, affidavit.
 
 
 57
 Accordingly, the February 14, 1990, and April 25, 1990, orders of the district court are hereby
 
 
 58
 AFFIRMED.
 
 
 
 *
 Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 In Placid Oil Co. v. Ashland Oil, Inc., 792 F.2d 1127 (Temp.Em.Ct.App.1986), the TECA found jurisdiction over an appeal of a district court decision terminating litigation of a claim based on EPAA regulations, therefore necessarily affecting the underlying substantive issues. However, this appeal follows a fully litigated ESA/EPAA action which presents the issue of whether the enforcement of the judgment of that fully litigated action is also integral to the underlying ESA/EPAA issue. Placid Oil therefore provides little instruction here
 
 
 [2]
 Section 7-8-317(1) reads: "No attachment or levy upon a security or any share or other interest evidenced thereby which is outstanding shall be valid until the security is actually seized by the officer making the attachment or levy but a security which has been surrendered to the issuer may be attached or levied upon at the source."
 
 
 [3]
 Section 10-2A-53(g) reads: "Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into his name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed."
 
 
 [4]
 In re Sandefer, 47 B.R. 133 (Bankr.N.D.Ala.1985), relied on by appellants, does not alter this conclusion. Sandefer involved the adequacy of a creditor's judgment lien against the assets of a liquidated corporation, the general situation Sec. 7-8-317 was designed to address, while the receiver's authority here was established by court order, a specific situation expressly addressed by Sec. 10-2A-53. (Even if Sec. 7-8-317 were to be considered controlling, subsection (2) provides for an exception to the physical possession requirement in situations where the property "cannot readily be attached or levied upon by ordinary legal process.")
 
 
 [5]
 Section 6-10-7 reads in part: "The wages, salaries or other compensation of laborers or employees, residents of this state, for personal services, shall be exempt from levy under writs of garnishment or other process for the collection of debts contracted or judgments entered in tort in an amount equal to 75 percent of such wages, salaries or other compensation due or to become due to such laborers or employees, and the levy as to such percentage of their wages, salaries or other compensation shall be void ..."
 
 
 [6]
 42 U.S.C. Sec. 407(a) reads: "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."
 
 
 [7]
 An alternative basis for finding that the Alabama exemption does not apply here is that the heavy activity in this account makes tracing the funds very difficult. However, Alabama courts have not addressed the issue of whether deposit of exempt wages in a bank account and subsequent commingling of funds causes a garnishee to lose his exemption