**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2005**

**PATRICK FISHER**
**Clerk**

PATTI L. REAMES,

      Plaintiff - Appellant,

v.

STATE OF OKLAHOMA, *ex rel.*
OKLAHOMA HEALTH CARE
AUTHORITY; OKLAHOMA
DEPARTMENT of HUMAN SERVICES;
MICHAEL FOGARTY; HOWARD
HENDRICK,

      Defendants - Appellees.

------------------------

THE ASSOCIATION FOR
COMMUNITY LIVING, INC.,

      Amicus Curiae.

No. 04-6002

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-02-1773-H)**

Lee M. Holmes, Holmes, Holmes & Neisent, P.L.L.C., Oklahoma City, Oklahoma,
(Tracy Speck Neisent, Holmes, Holmes & Neisent, P.L.L.C., Oklahoma City, Oklahoma
with him on the briefs) for the Appellant.

Andrew Tevington, Assistant Attorney General, State of Oklahoma, Oklahoma City,
Oklahoma, (Travis Smith, Assistant General Counsel, Oklahoma Department of Human

Services, Oklahoma City, Oklahoma, with him on the briefs), for the Appellees.

---

Before **LUCERO** and **McCONNELL**, Circuit Judges**,** and **ANDERSON**, Senior Circuit Judge.

---

**LUCERO**, Circuit Judge.

---

Patti Reames, a Social Security recipient, appeals the lower court ruling that the Oklahoma Department of Human Services did not violate federal law when it determined that she cannot use a federal statutory "special needs trust" to prevent Oklahoma from taking her Social Security income as Medicaid co-pay. Because we conclude that Oklahoma is not acting contrary to Congressional intent, we **AFFIRM**.

**I**

Reames is a 51-year-old disabled inhabitant of an Oklahoma nursing home whose only income is from monthly Social Security Disability ("SSD") benefits payments she has received since her disability more than five years ago. Almost all of the monthly benefit is paid as co-pay to her nursing home under Oklahoma Medicaid rules. In an attempt to keep Oklahoma from using her check as co-pay, on February 26, 2002, Reames' mother created a Special Needs Trust as authorized by 42 U.S.C. § 1396p(d)(4)(A). Enacted in 1993 as part of Congress's revision of how trusts were treated under Medicaid, this section enables the "assets" of a disabled individual under the age of 65 to be contributed to a Special Needs Trust for her benefit without having

2

such assets treated as countable assets for Medicaid purposes.[1]  The day after the creation

of the § (d)(4)(A) trust, Reames assigned her monthly SSD check to the trust through

direct deposit.

In April, 2002, Reames applied to the Oklahoma Department of Human Services

("OKDHS"), the state agency that determines Medicaid eligibility and disbursement,

requesting that Medicaid pay for her nursing-home care.  In June, her application was

approved, effective retroactively to when her assets had been placed in the trust, but

OKDHS took account of Reames' SSD in its determination of her co-pay, and the notice

of approval thus required her to pay $796 of her $846 check to the nursing home every

month.  This determination is in accordance with Medicaid regulations that require states

to take Social Security income into account for purposes of establishing the amount of

beneficiaries' co-pay.  Reames filed an administrative appeal, an administrative hearing

was held, and a Fair Hearing Decision was issued affirming the co-pay calculation.

Another administrative appeal was filed to the Director of OKDHS, who also upheld the

co-pay determination.

Her administrative remedies thus having been exhausted, Reames filed suit in

district court against OKDHS, the Oklahoma Health Care Authority ("OCHA"), OKDHS

Director Headrick and OHCA Chief Executive Officer Fogarty, arguing that the

---

[1] The beneficiaries of such trusts can have no direct control over the funds
contained therein, and all the Medicaid funds they receive over the course of their lives
have to be repaid out of the trust upon their deaths.

3

§ (d)(4)(A) trust statute on its face both protects the SSD benefits she assigned to the trust from being taken into account by Oklahoma in its co-pay determination, and supercedes any state or federal Social Security or Medicaid regulations. Reames sought three kinds of relief: 1) a declaration that defendants' method of computing her Medicaid benefits is illegal, 2) injunctive relief enjoining defendants from considering the disability income placed in the trust in determining her Medicaid benefits, and 3) an order requiring defendants to restore to plaintiff the amounts she asserts have been wrongfully applied toward the cost of her nursing-home care (despite her assertion that she "does not seek a money judgment against the state"). Based in part on sovereign immunity determinations and in part on the perceived compatibility of Oklahoma's Medicaid scheme with the federal legal and regulatory framework, the district court affirmed Oklahoma's administrative determinations and dismissed the suit. Reames now appeals the district court decision.

## II

In its Eleventh Amendment analysis, the district court let Reames' suit for declaratory and injunctive relief against all defendants move forward, and dismissed any claims she made for retroactive compensatory relief. This court reviews de novo a district court's Eleventh Amendment immunity determination. Lewis v. N.M. Dep't of Health, 261 F.3d 970, 975 (10th Cir. 2001).

The Eleventh Amendment provides that "the Judicial power of the United States

4

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. This Amendment precludes not only actions in which the state is directly named as a party, but also actions brought against a state agency or state officer where the action is essentially one for recovery of money from the state treasury. Edelman v. Jordan, 415 U.S. 651, 677 (1974) (barring any "retroactive award which requires the payment of funds from the state treasury" and limiting the federal courts to providing only "prospective injunctive relief" against state officials sued in their official capacity).[2] However, the possibility – indeed, even the "inexorability" – that a court's ruling may ultimately lead to the payment of state funds does not necessarily transmute the relief at issue into an impermissible award of damages. See Quern v. Jordan, 440 U.S. 332, 347 (1979).

Nevertheless, if the relief sought only requires state expenditures pursuant to a court order requiring a change in state conduct, the Eleventh Amendment will not ordinarily preclude actions brought against the state. For example, in Milliken v. Bradley, 433 U.S. 267 (1977), the Supreme Court held that a Sixth Circuit order requiring defendants to implement remedial education programs as an adjunct to desegregating the Detroit public school system did not violate the Eleventh Amendment. Because the

---

[2] State officials sued in their official capacity for prospective relief are "persons" for purposes of § 1983; such suits are not treated per se as suits against the state, even though relief will come from the state fisc. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.10 (1989).

expenditure was ancillary to the defendants' compliance in the future with the court's order to "conform their conduct to requirements of federal law," ordering the necessary expenditure of funds for the programs was within the federal courts' remedial powers. Id. at 289.

Reames' case is more analogous to Edelman than to Milliken because it is easy to distinguish the remedy for past misinterpretations of federal law (reimbursement for co-pays already paid) from the remedy for future ones (ordering Oklahoma prospectively to cease taking a co-pay). Retroactive benefits cannot therefore be seen as an adjunct of a court-ordered prospective relief, but could only constitute redress for past violations of federal law. As such, and because the funds not disbursed to Reames are intermingled in the state fisc, retroactive benefits paid to Reames would be indistinguishable from damages. Edelman squarely holds that such relief is outside the remedial power of the federal courts, as contrasted with "prospective declaratory and injunctive relief," which may be subject to exception from the sovereign immunity doctrine. Edelman, 415 U.S. at 666 n.11 (1974). Therefore, OKDHS and OCHA are entitled to immunity from suit insofar as Reames seeks retroactive benefits.

The Eleventh Amendment does not prevent plaintiffs from bringing suits against state officials like Hendrick and Fogarty in their individual and personal capacities. Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974). However, it is unclear whether Reames sues Hendrick and Fogarty in their individual or in their official capacity. In Kentucky v.

6

Graham, 473 U.S. 159, 167 n.7 (1985), the Supreme Court recognized that while a complaint may not always clearly specify whether state officials are sued personally or officially, the "course of proceedings" will usually indicate the nature of the suit. Reames has consistently directed all of her arguments to the actions of OKDHS and OCHA, taken through its agents Hendrick and Fogarty. At no time did she seek to impose liability on Hendrick or Fogarty independent of the actions of their agencies. Reames has treated this lawsuit from its inception as a suit against the state, premised upon the actions of its agents, and therefore money damages are barred under the Eleventh Amendment.

On this basis, the district court properly granted defendants' motion to dismiss on grounds of immunity insofar as it addressed the defendants' potential liability for restoring to Reames the amounts she asserts have been wrongfully applied toward the cost of her nursing-home care. The trial court also correctly denied the motion insofar as she sought prospective declaratory and injunctive relief.

### III

A district court's review of agency action is a question of law that we review de novo. Public Lands Council v. Babbitt, 167 F.3d 1287, 1293 (10th Cir. 1999).

The dispute between Reames and the state of Oklahoma stems from the fact that the Special Needs trust generally authorizes protection of assets, including income, from Medicaid determinations, whereas state and federal Medicaid regulations mandate that states take income into account in determining co-pay. Section § (d)(4)(A) enables

7

disabled individuals under age 65 to contribute "assets" to a Special Needs Trust for their benefit without having such assets treated as countable assets for Medicaid purposes. Section 1396p(e)(1) defines "assets" as "all income and resources of the individual." For Medicaid-determination purposes, "the term 'income' has the meaning given . . . in section 1382(a) of this title." 42 U.S.C. § 1396p(e)(2). Section 1382(a) defines income to include benefits. Therefore, following the statutory definitions and cross-references, it follows that § (d)(4)(A) authorizes the benefits of an individual to be contributed to a Special Needs Trust. On the other hand, the federal regulation governing Medicaid co-pay mandates that a state agency must reduce its payments to the institution in an amount equal to the institutionalized Medicaid recipient's income. 42 C.F.R. § 435.733.[3] Social Security regulations mandate that unearned income be counted at the moment it is received. 20 C.F.R. § 416.1123(a). Therefore, federal Medicaid regulations mandate that states take income into account in determining co-pay at the time it is received by the individual. Oklahoma purports to comply with the requirements of both the Special Needs Trust statute and federal Medicaid regulations by counting income placed in the trust for purposes of determining co-pay, but allowing such income to be protected for purposes of determining an individual's eligibility for Medicaid to begin with, a

---

[3] Reames argues that because the Social Security Administration issued § 435.733 prior to Congress's creation of § (d)(4)(A) trusts, the regulation is outdated. However, failure to issue new regulations could also indicate contentment with the current statutory/regulatory scheme.

compromise Reames maintains is precluded by federal law.

To resolve these conflicting mandates, we begin our inquiry with Oklahoma's implementation of federal regulations governing the administration of its Medicaid program. Oklahoma sets forth its policies for administering Medicaid benefits in its State Medicaid Manual ("SMM"). Relevant to the present inquiry, § 3259.7(B)(1)[4] of the SMM ends with the instruction, "For a detailed discussion of how these policies apply to income placed in an exempt trust for a disabled individual, see subsection C [covering Miller trusts]." Section 3259(C), in turn, says,

> "Income placed in a Miller trust is income for SSI purposes although it is not counted as available in determining Medicaid <u>eligibility</u>. Thus, such income is also subject to the post-eligibility rules. Because income placed in a Miller trust is income as defined by SSI (although it is not counted for Medicaid eligibility purposes), all income placed in a Miller trust is combined with countable income not placed in the trust for post-eligibility purposes."
> SMM § 3259.7(C)(5)(b) (emphasis added).

The SMM also reflects 42 C.F.R. § 435.733, which requires states to reduce their Medicaid payments in an amount equal to a recipient's income. Therefore, it would seem that OKDHS faithfully executes these provisions: the agency honors § (d)(4)(A) trusts for eligibility determinations, but it does not acknowledge that the trusts apply to co-pay determinations.

Reames maintains that OKDHS's consideration of income deposited in her trust

_____

[4] The regulation is in the section on "Pooled Trusts," but explicitly says that its dictates apply equally to § (d)(4)(A) Special Needs Trusts.

and subsequent reduction of the amount of her Medicaid payments is invalid because it conflicts with 42 U.S.C. § 1396p(d)(1), which states that "for purposes of determining an individual's eligibility for, <u>or amount of</u> benefits under a State plan under this subchapter," the general rule is to count money in a trust – "<u>subject to [section § (d)(4)(A)]</u>." (emphases added)   Under Medicaid trust law, Reames argues, the § (d)(4)(A) protections apply for purposes of determining co-pay just as much as for determining eligibility.

In order to conclude that the Special Needs Trust, in conjunction with § 1396p(d)(1), permits us to invalidate the SMM, we would have to conclude that the state agency's policy is in conflict with the purposes of federal law clearly expressed by Congress in these statutes.  Because the pastiche of references and incorporations required to do so is so haphazard and complex, we cannot conclude that Congress, in passing §§ 1396p(d)(4)(A) and 1396p(d)(1), has addressed itself to the precise question at hand:  whether a state must ignore federal benefits individuals place in a § (d)(4)(A) trust for purposes of determining the amount of their state Medicaid benefits.

The degree of deference this court owes to state agency action is not clearly defined.   State agencies are not subject to "notice and comment" requirements, as federal agencies generally are.  Notice and comment is in part the basis for judicial deference to federal agency action.  See <u>Tax & Accounting Software Corp. v. United States</u>, 301 F.3d 1254, 1260 (10th Cir. 2002).  Therefore, "to the extent the State Medicaid Manual

10

conflicts" with even the "purposes" of a federal statute, "we do not follow it." Ramey v. Reinertson, 268 F.3d 955, 963 (10th Cir. 2001) (emphasis added). To determine whether to give effect to state regulation, Chevron's questions are helpful, but not necessarily dispositive. Chevron first asks if Congress has spoken on the precise question at issue. Chevron U.S.A., Inc. v. National Res. Def. Council, 467 U.S. 837, 842-43 (1984) (employing the traditional tools of statutory construction). Specific Congressional intent is law and must be given effect. Id. at 843 n.9. Under Chevron's second step, the court must defer to the agency's interpretation so long as it is "reasonable" and "based on a permissible construction of the statute." Id. at 843.

Oklahoma gives effect to the clear intent of Congress, expressed in § 1396p(d)(1), that once money is actually in the trust, it is given absolute protection both for eligibility and "amount-of" determinations. SMM § 3259.7(B)(1) provides that "income does not count . . . as income received by the individual" when the right to the income "actually belongs to the trust and not the individual." Thus, Oklahoma, in accordance with § 1396p(d)(1), recognizes that § (d)(4)(A) can protect income that 42 C.F.R. § 435.733 would seem to mandate the state take into account for co-pay determinations. It simply tries to give effect to the federal regulation as well, by taking into account for co-pay determinations SSD benefits that pass through the beneficiary's hands before arriving at the trust. The question before us is whether Congress meant to preclude the distinction Oklahoma makes between Social Security income placed in a trust and Social Security

11

income directly assigned.[5]

As discussed above, Congress did not specify whether it intended that § (d)(4)(A) protect only assigned income; § (d)(4)(A) itself speaks only of "assets," and the Medicaid "definitions" section defines "assets" as "all income and resources of the individual." 42 U.S.C. § 1396p(e)(1). A different subsection altogether, not referred to by § (d)(4)(A) or § 1396(p)(e)(1), provides that for Medicaid-determination purposes, "the term 'income' has the meaning given . . . in section 1382a of this title." 42 U.S.C. § 1396p(e)(2).

Section 1382(a), in turn, has nothing specifically directed toward Medicaid regulations; it is a set of Social Security governing statutes. The incorporation of Social Security law is based on Medicaid's complex eligibility rules, which provide that "the methodology to be employed in determining eligibility shall be no more restrictive than the methodology which would be employed under" whatever program to which the applicant is most closely "related." 42 U.S.C. § 1396(a)(10)(C)(i)(III). In the end, § 1382(a) includes government benefits in the definition of income, and § 1396p(d)(1) indirectly endorses treating money in a Special Needs Trust the same for both eligibility and "amount-of" determinations. Yet, given the tortured concatenation of United States

---

[5] Reames purports to have assigned her SSD benefits check to the trust such that it actually "belongs to the trust," but OKDHS takes the benefits income into account because it deems the assignment void by law. The actual validity of the transfer gains salience later in our analysis, but if Congress specifically intended that income belonging to the trust be treated the same as income belonging to the individual, we need not reach the question of whether the assignment was valid because 1396p(d)(1) would mandate that the income be protected for "amount-of" determinations either way.

Code provisions required to arrive at the conclusion that these federal laws preclude Oklahoma's regulatory scheme and its straightforward implementation of 42 C.F.R. § 435.733, requiring states to reduce their Medicaid payments in an amount equal to a recipient's income, it would be implausible at best to conclude that Congress so intended.

We also cannot say that the SMM is "unreasonable" or based on an "impermissible construction" of the Congressionally mandated statutory scheme. The SMM provides for full § (d)(4)(A) protection to all those who would use it to protect income received from sources other than Social Security, and attempts to effectuate both federal law and federal regulation even for that narrow class of disabled individual. See Chevron, 467 U.S. at 843. Given all these factors, we conclude that the SMM does not conflict with the "purposes" of federal law, and we therefore follow it. See Ramey, 268 F.3d at 963.

**IV**

Therefore, § 1396p(d)(1) only gives § (d)(4)(A) shelter to Reames' benefits check if the income does not pass through her hands.[6] See SMM § 3259.7(B)(1). This is Reames' argument in the alternative. Given that the SMM is valid, the only way around it is to assign her SSD check directly to the § (d)(4)(A) trust, thereby protecting it for

---

[6] Unless it is irrevocably assigned, which it is not. A Note to SMM § 3259.7(C)(5)(b) clarifies that the eligibility/post-eligibility distinction applies "only to those situations in which an individual first receives income and then places it into a Miller trust. It does not apply to situations in which an individual has irrevocably transferred his or her right to receive income to the trust." Counsel conceded at oral argument that Reames could reassign the Social Security check to her own name at any time.

13

"amount-of" Medicaid determinations as provided for by SMM § 3259.7(B)(1). The dispositive question in this case is therefore whether the law permits Reames to assign her income to the trust. After an in-depth study of the relevant statutes and caselaw, we conclude that it does not.

To convert her benefits check into "trust assets" by preventing it from passing through her hands, Reames assigned it by direct deposit to the Special Needs Trust. This assignment fails because it is barred by Social Security law.

> The right of any person to any future [Social Security] payment . . . shall not
> be transferable or assignable, at law or in equity, and none of the moneys
> paid or payable or rights existing under this title shall be subject to
> execution, levy, attachment, garnishment, or other legal process, or to the
> operation of any bankruptcy or insolvency law.

42 U.S.C. § 407(a). Section 407, which governs payment of Social Security benefits, mandates that "the right of any person to any future payment under this title [42 USCS §§ 401 et seq.] shall not be transferable or assignable." OKDHS argues that because this statute prevents Reames from assigning her SSD benefits, Medicaid should not give effect to her invalid action and should treat the SSD money as if it had passed through her hands.

Reames first argues that § 407 should not apply to her because her transfer is

voluntary. The Ninth Circuit, for example, in <u>Lopez v. Washington Mutual Bank</u>, 302 F.3d 900, 904 (9th Cir. 2002), held that a violation of § 407 did not occur because there was "no indication that the plaintiffs did not voluntarily agree to apply their SSI benefits in such a fashion." Because Reames voluntarily assigned her benefits check to the trust, this reasoning would legitimize the transfer. However, this argument proves too much: the unscrupulous lender or confidante could well convince the beneficiary that it was in the beneficiary's best interest to transfer the check. Were we to adopt a broad reading of the Ninth Circuit's holding, we would eviscerate § 407's protections for the gullible and infirm.

Reames next argues that, if we hold that § 407 can apply to voluntary assignment, we should not give effect to the plain language of the statute preventing her from assigning her money to her Special Needs Trust. She argues that the clear intent of § 407 is to protect the SSD beneficiary and that we should therefore not read it in such a way that defeats that purpose. Indeed, courts have uniformly recognized that the purpose of § 407 is to protect Social Security beneficiaries and their dependents from the claims of creditors. <u>See</u> <u>Dionne v. Bouley</u>, 757 F.2d 1344, 1355 (1st Cir. 1985); <u>Fetterusso v. New York</u>, 898 F.2d 322, 327 (2d Cir. 1990); <u>Dept. of Health and Rehabilitative Servs. v. Davis</u>, 616 F.2d 828, 831 (5th Cir. 1980); <u>Mason v. Sybinski</u>, 280 F.3d 788, 793 (7th Cir. 2002).

These cases all chose to overlook the statute's plain language in order not to defeat

Congress's intent in either § 407 or other provisions of the Social Security code. The Eleventh Circuit noted in Citronelle-Mobile Gathering, Inc. v. Watkins, 934 F.2d 1180, 1192 (11th Cir. 1991), that "neither the purpose of the benefits, nor the purpose of . . . [the special rule in question], is accomplished by barring Florida from reimbursement." Citronelle, 934 F.2d at 1192 (citation omitted). Accord Mason, 280 F.3d at 793 (refusing to apply § 407 where "Congress and the Social Security Administration saw fit to allow state hospitals to act as representative payees"). Although we acknowledge that the statute was probably not drafted with Reames' situation in mind, we cannot ignore the plain language of the statute, which expressly forbids assignment of Social Security benefits.

Furthermore, distinguishing the case at bar is the fact that the joint application of § (d)(4)(A) and § 407 does not necessarily lead to the application of no law at all, as the joint application of the conflicting Social Security laws in the cases above would have done. See, e.g., Mason, 280 F.3d at 493 (concluding that "Congress allowed state hospitals to act as representative payees when certain safeguards were met," and that the system could not stand if § 407 were applied strictly). Similarly, Reames argues that to apply § 407 to SSD checks assigned to a § (d)(4)(A) Trust would render § (d)(4)(A) a nullity, permitting the government to give and then immediately take away. It would also, she claims, defeat the purpose of § 407. Neither assertion is true. The assets of disabled people under 65 still have the full protection of § (d)(4)(A) to the extent that the

16

protection does not conflict with the narrow carve-out created by § 407.[7]  The fact that

this so deeply affects Reames' narrow subclass of Special Needs trust beneficiary does

not take away from the non-nullity of § (d)(4)(A) to those individuals who protect assets

they had prior to setting up the trust, inherited assets, or assets from settlements

compensating them for their disabling injuries.  Similarly, § 407 continues to protect

Reames and all other Social Security beneficiaries and their dependents from the claims

of creditors.  To tinker with that scheme could open the door for a loss of protection down

the road.

Despite both sides' use of the word "conflict," the § 407 issue does not truly

present a conflict in the sense that one statute or regulation permits something barred by

the other.  Nothing in § 1396p(d)(4)(A) addresses the assignment of Social Security

benefits, or assignment at all.  That Reames is caught in the pinch between these two

statutes is unfortunate and could be remedied statutorily, but this court has held that

"[u]nless the plain language of the statute would produce a result demonstrably at odds

with the intention of its drafters, the court must give effect to the clear meaning of the

statute as written."  Starzynski v. Sequoia Forest Indus., 72 F.3d 816, 820 (10th Cir.

1995).  Accordingly, we **AFFIRM** the lower court's determination that Oklahoma acted

---

[7] Reames asserts that we should ignore § 407's proscription because of the canon of statutory construction that more specific statutes predominate over more general statutes in conflict.  Such determinations can frequently be flipped.  In this case, we are hard-pressed to see why § 407, prohibiting one particular disposition of one particular government benefit, is less specific than 42 U.S.C. § 1396p(d)(4)(A).

correctly in taking Reames trust assets into account when determining her nursing home co-pay.